DONALD RUSSELL, Circuit Judge:
Confronted, if not overwhelmed, with an avalanche of actions filed in various state and federal courts throughout the United States by citizens of this country as well as of foreign countries seeking damages for injuries allegedly sustained by the use of an intrauterine contraceptive device known as a Daikon Shield,[1] the manufacturer of the device, A.H. Robins Company, Incorporated (Robins) filed its petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., in August, 1985.

Background

The device, which is the subject of these suits, had been developed in the 1960’s by Dr. Hugh Davis at the Johns Hopkins Hospital in Baltimore, Maryland.[2] In mid-1970 Robins acquired all patent and marketing rights to the Daikon Shield and engaged in the manufacture and marketing of the device from early 1971 until 1974, when it discontinued manufacture and sale of the device because of complaints and suits charging injuries arising allegedly out of the use of the device. The institution of Daikon Shield suits did not, however, moderate with the discontinuance of manufacture of the device, since Robins did not actually recall the device until 1984.[3] By the middle of 1985, when the Chapter 11 petition was filed the number of such suits arising out of the continued sale and use of the Daikon Shield device earlier put into the stream of commerce by Robins had grown to 5,000. More than half of these pending cases named Robins as the sole defendant; a co-defendant or co-defendants were named in the others. Prior to the filing, a number of suits had been tried and, while Robins had prevailed in some of the actions, judgments in large and burdensome amounts had been recovered in others. Many more had been settled.[4] Moreover, the costs of defending these suits both to Robins and to its insurance carrier had risen into the millions. A large amount of the time and energies of Robins’ officers and executives was also being absorbed in preparing material for trial and in attending and testifying at depositions and trials. The problems arising out of this mounting tide of claims and suits precipitated this Chapter 11 proceeding.
The filing of the Chapter 11 petition automatically stayed all suits against Robins itself under section 362(a) of the Bankruptcy Code, even though no formal order of stay was immediately entered. See In re Larmar Estates, 5 B.R. 328, 330 (Bankr.E. D.N.Y.1980). But a number of plaintiffs in suits where there were defendants other than Robins, sought to sever their actions against Robins and to proceed with their claims against the co-defendant or co-defendants. Robins responded to the move by filing an adversary proceeding in which it named as defendants the plaintiffs in eight such suits pending in various state and federal courts. In that proceeding, the debtor sought (1) declaratory relief adjudg *997 ing that the debtor’s products liability policy with Aetna Casualty and Insurance Company (Aetna) was an asset of the estate in which all the Daikon Shield plaintiffs and claimants had an interest and (2) injunctive relief restraining the prosecution of the actions against its co-defendants. Service of the summons and complaint in that adversary proceeding, a memorandum of law in support of the motion for a preliminary injunction therein, a notice of the debtor’s intention to apply for a temporary restraining order, a copy of the proposed temporary restraining order and affidavits in support were duly mailed by first-class mail and by Federal Express to all the defendants and their attorneys at their addresses. See Bankruptcy Rule 7004 and Rule 4, Fed.R.Civ.P.
The debtor’s application for a temporary restraining order and for the setting of a date for a hearing on the request for preliminary injunction in the adversary proceeding was heard ex parte by the district judge who had jurisdiction over the proceedings.[5] The district judge granted at the time a temporary restraining order in the proceedings and set a hearing on the debtor’s application for a preliminary injunction. On that same day, Robins mailed by first-class mail and by Federal Express to all the defendants and their attorneys at their addresses “Notice of Hearing on Plaintiff’s Motion for Preliminary Injunction.”
At the hearing on the motion for a preliminary injunction, a number of defendants as well as the Committee constituted by the court to represent Daikon Shield Claimants appeared by counsel.[6] At the commencement of the hearing the defendant Piccinin, a plaintiff in one of the Dai-kon Shield actions which Robins sought to stay, filed through her attorney a written motion to dismiss as against her. No other defendant filed a motion in response to the motion for a preliminary injunction. After receiving certain testimony, admitting various records, and hearing arguments of parties, the district court granted Robins’ request for a preliminary injunction.
In his order granting the preliminary injunction, the district judge found (1) that continuation of litigation in the civil actions threatened property of Robins’ estate, burdened and impeded Robins’ reorganization effort, contravened the public interest, and rendered any plan of reorganization futile; (2) that this burden on Robins’ estate outweighed any burden on the Daikon claimants caused by enjoining their civil actions; and (3) that all remaining insurance coverage in favor of the debtor under its liability policy issued by Aetna was property of the Robins’ Chapter 11 estate. The district judge then held that all actions for damages that might be satisfied from proceeds of the Aetna insurance policy were subject to the stay pursuant to 11 U.S.C. § 362(a)(3) and enjoined further litigation in the eight civil actions, pursuant to 11 U.S.C. § 362(a)(1), (3) as supplemented by 11 U.S.C. § 105.
Only the defendants Piccinin, the Mosas, and Conrad filed timely notices of appeal from the grant of the preliminary injunction. Their appeals, questioning the propriety of that preliminary injunction as against suits by Robins’ co-defendants is the first of the issues now before this Court.
Some three weeks after entry of the preliminary injunction, Robins filed a motion for (1) a determination of trial venue of all Daikon Shield suits, (2) identification of such Daikon Shield cases as were “related to” the Chapter 11 case, and (3) transfer of such cases to the Eastern District of Virginia for trial. It also requested an expe *998 dited hearing on these motions. This request for an expedited hearing was granted and the expedited hearing was set ten days later. Notice of the hearing was given the Representatives of the Daikon Shield Claimants Committee and the Unsecured Creditors Committee. The Committees and the defendants Piccinin, the Mosas and Conrad appeared by counsel at the hearing and joined in entering objections to the motion.
After a hearing on the motions, the district judge entered an order holding that (1) pursuant to 28 U.S.C. § 1834(b), all actions based upon personal injury tort or wrongful death claims arising from the use of the Daikon Shield were proceedings related to this Chapter 11 case over which this court had jurisdiction; (2) pursuant to 28 U.S.C. §§ 157(b)(5)[7] and 1334(b), all such actions, wherever pending, were to be tried in the Richmond Division of the United States District Court for the Eastern District of Virginia; (3) all actions related to the Robins’ Chapter 11 case now pending in any federal district court or subsequently removed to any federal district court, during the pendency of this Chapter 11 case, were to be transferred to this court [the Richmond Division of the United States District Court]; and (4) nothing in the order limited the power of this court [the Richmond Division of the United States District Court] later to abstain from hearing any proceeding under section 1334(c)(1) or remanding under section 1452(b), 28 U.S.C.
From this order, the Committee of Representatives of Daikon Shield Claimants and the defendant Piccinin have appealed.[8] This appeal poses the second issue on appeal.
I
The initial question in the appeal of the first issue relates to the court’s jurisdiction to grant a stay or injunction of suits in other courts against co-defendants of the debtor or of third parties; none of the parties herein contest the jurisdiction of the bankruptcy court to stay actions against the debtor itself in any court. Jurisdiction over suits involving co-defendants or third-parties may be bottomed on two statutory-provisions of the Bankruptcy Act itself as well as on the general equitable powers of the court. The first of these statutory grants of jurisdiction is found in section 362, 11 U.S.C. The purpose of this section by its various subsections is to protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor. Matter of Holtkamp, 669 F.2d 505, 508 (7th Cir.1982). As the Court in Fidelity Mortg. Investors v. Camelia Builders, Inc., 550 F.2d 47, 55 (2d Cir.1976), cert. denied, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540, put it, “[t]he stay insures that the debtor’s affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another.”
Section 362 is broken down into several subsections, only two of which are relevant on this appeal. The first of such subsections is (a)(1), which imposes an automatic stay of any proceeding “commenced or [that] could have been commenced against the debtor” at the time of the filing of the Chapter 11 proceeding; the second is (a)(3), which provides similar relief against suits involving the possession or custody of property of the debtor, irrespective of whether *999 the suits are against the debtor alone or others. We shall discuss the extent of jurisdiction given the bankruptcy court under these two subsections, beginning with (a)(1).
(a)
Subsection (a)(1) is generally said to be available only to the debtor, not third party defendants or co-defendants. The rationale for this narrow construction of the statute has been stated in Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194, 1196-97 (6th Cir.1983), and in our own case of Williford v. Armstrong World Industries, Inc., 715 F.2d 124, 126-27 (4th Cir.1983), and it need not be repeated here. However, as the Court in Johns-Manville Sales Corp., 26 B.R. 405, 410 (S.D.N.Y. 1983) remarked, in discussing the oft-cited case, Royal Trucks & Trailer v. Armadors Meritina Salvadoreana, 10 B.R. 488, 491 (N.D.Ill.1981),[9] “there are cases [under 362(a)(1)] where a bankruptcy court may properly stay the proceedings against non-bankrupt co-defendants” but, it adds, that in order for relief for such non-bankrupt defendants to be available under (a)(1), there must be “unusual circumstances” and certainly “ ‘[something more than the mere fact that one of the parties to the lawsuit has filed a Chapter 11 bankruptcy must be shown in order that proceedings be stayed against non-bankrupt parties.’ ” This “unusual situation,” it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debt- or on account of any judgment that might result against them in the case. To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute. This fact was recognized by the court in In Re Metal Center, 31 B.R. 458 (D.Conn.1983).
In Metal Center the third-party plaintiff had been sued, along with the debtor, on his guaranty of the debtor’s obligation. The third-party was entitled to be indemnified by the debtor on account of any judgment rendered against him because of his guaranty. While the action against both the debtor and the guarantor was pending, the debtor filed its Chapter 11 petition. The action was stayed against the debtor but the plaintiff sought to continue his suit against the guarantor. The guarantor at this point moved to stay the action as against him. The bankruptcy court reviewed the motion because of the possible “effect upon the debtor of a state court judgment against Gardner [the guarantor].” In discussing the issue, the court first dismissed as inapplicable to the facts of this case the situation where the third-party defendant was “independently liable as, for example, where the debtor and another are joint tort feasors or where the nondebtor’s liability rests upon his own breach of duty.” It noted that in such a case “the automatic stay would clearly not extend to such non debtor.” But, in contrast to those situations, it declared that “where, however, a debtor and nondebtor are so bound by statute or contract that the liability of the nondebtor is imputed to the debtor by operation of law, then the Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code.” It concluded with the statement: “Clearly the debtor’s protection must be extended to enjoin litigation against others if the result would be binding upon the debtor’s estate,” and this is so, whether the debtor is a party or not. 31 B.R. at 462.
It is true that, although the third-party defendant in Metal Center was found to be entitled to indemnity from the debtor, the court held that the situation was not such as to qualify for a stay under section 362(a)(1). The court reached this conclusion because in its opinion the judgment in the suit against the third-party would not *1000 be binding on the bankruptcy court. Of course, if the indemnitee, who has suffered a judgment for which he is entitled to be absolutely indemnified by the debtor, cannot file and have allowed as an adjudicated claim the actual amount of the judgment he has secured but must submit his claim for allowance in the bankruptcy proceeding with the prospect that his claim may not be allowed in the full amount of the judgment awarded in favor of him, the indemnitee will be unfairly mulcted by inconsistent judgments and his contract of indemnity in effect nullified. We do not accept such reasoning with its shocking result and would find a stay under (a)(1) acceptable. Apparently the court in Metal Center recognized the inconsistency and the injustice resulting from its refusal to sustain a stay under (a)(1) for it did grant a stay of the action against the third-party but on equitable grounds, finding in justification that “severing and remanding [the plaintiffs action against the indemnitee to the state court for trial and judgment would] ... potentially expose[s] Gardner [the in-demnitee] to inconsistent judgments.” 31 B.R. at 463. While, as we have said, it seems that a ruling sustaining the stay in that case under section 362(a)(1) would have been more logical and appropriate, it is unimportant whether the stay is granted under section 362(a)(1) or on equitable grounds: the result is the same; a stay is proper in such a situation.
In Seybolt v. Bio-Energy of Lincoln, Inc., 38 B.R. 123 (D.Mass.1984), the issue was similar to that in Metal Center, i.e., whether a guarantor entitled to indemnity by the debtor would be entitled to seek a stay under section 362(a)(1). In granting the stay in that case, the Court, after quoting the language of Metal Center with respect to the case in which “the liability of the non-debtor is imputed to the debtor by operation of law,” said:
The concept that notice and an opportunity to defend binds the principal on a judgment against a guarantor (in a case in which the principal did not participate) springs from notions of res judicata. If George Seybolt recovers a judgment against the guarantors in the state court, Bio-Energy Associates’ assertion that the $100,000 was not a loan but a contribution to capital may well be rendered moot when the guarantor subsequently asserts a claim against it for indemnity. At the very least, the dual litigation of these issues in the state court and the bankruptcy court is not judicially economic and potentially exposes Bio-Energy, Inc. and Bio-Energy Associates to inconsistent judgments. See In re Metal Center, Inc., supra, at 463.
Accordingly, I find that George Sey-bolt’s claims against the individual guarantors are within this Court’s jurisdiction and should be stayed until an appropriate motion for relief from stay is filed and granted by the bankruptcy court. 38 B.R. at 127-28.
In Re Brentano’s, 27 B.R. 90 (S.D.N.Y. 1983) , also involved the situation of a guarantor of a debtor in a Chapter 11 proceeding who was entitled under contract to indemnity by the debtor against any judgment against him. While the case did not directly concern section 362 but the question of bankruptcy jurisdiction, the language of the court appears relevant on the issue under review here. It said that the action against the guarantor-indemnitee “could and would affect the estate in bankruptcy,” since, under the indemnity agreement, “a judgment in favor of the [plaintiff] in the guaranty action would automatically result in indemnification liability against Brentano’s” [i.e., the indemnitor]. Accepting this language one would have difficulty in not concluding that the action was in effect one against the debtor and as such would qualify for relief under (a)(1). Brentano’s is cited and discussed in Pacor, Inc. v. Higgins, 743 F.2d 984, 995 (3d Cir. 1984) , which was an asbestos case. The issue in Pacor, as in Brentano’s, was one of bankruptcy jurisdiction. The court described the facts in Brentano’s and stated the resulting legal situation as follows:
In Brentano’s, however, it is clear that the action between the landlord and Mac-Millan could and would affect the estate *1001 in bankruptcy. By virtue of the indemnification agreement between Brentano’s and MacMillan, a judgment in favor of the landlord on the guarantee action would automatically result in indemnification liability against Brentano’s. See also In re Johnie T. Patton, Inc., 12 B.R. 470 (Bankr.D.Nev.1981); In re Lu-casa International, Ltd., 6 B.R. 717 (Bankr.S.D.N.Y.1980); In re Brothers Coal Co., 6 B.R. 567 (Bankr.W.D.Va. 1980) (all involving guarantors of debt- or’s obligations). Moreover, even in the absence of an explicit indemnification agreement, an action by a creditor against a guarantor of a debtor’s obligations will necessarily affect that that [sic] the creditor’s status vis a vis other creditors, and administration of the estate therefore depends upon the outcome of that litigation. 743 F.2d at 995.
Pacor, however, found Brentano’s inapplicable in its case because:
In this case, however, there would be no automatic creation of liability against Manville on account of a judgment against Pacor. Pacor is not a contractual guarantor of Manville, nor has Man-ville agreed to indemnify Pacor, and thus a judgment in the Higgins-Pacor action could not give rise to any automatic liability on the part of the estate. 743 F.2d at 995.
The clear implication of the decision is that, if there had been a contract to indemnify, a contrary result would have been in order.
(b)
But (a)(1), which stays actions against the debtor and arguably against those whose interests are so intimately intertwined with those of the debtor that the latter may be said to be the real party in interest, is not the only part of section 362 providing for an automatic stay of proceedings. Subsection (a)(3) directs stays of any action, whether against the debtor or third-parties, to obtain possession or to exercise control over property of the debt- or. A key phrase in the construction and application of this section is, of course, “property” as that term is used in the Act. Section 541(a)(1) of the Bankruptcy Act defines “property” in the bankruptcy context. It provides that the “estate is comprised of all the following property, wherever located ... all legal or equitable interests of the debtor in property as of the commencement of the case.” The Supreme Court in construing this language in United States v. Whiting Pools, Inc., 462 U.S. 198, 205, n, 9, 103 S.Ct. 2309, 2313, n. 9, 76 L.Ed.2d 515, quoted this language in the legislative history of the Section:
The scope of this paragraph [541(a)(1) ] is broad. It included all kinds of property including tangible or intangible property, causes of action (see Bankruptcy Act § 70a(6)), and all other forms of property currently specified in section 70a of the Bankruptcy Act.
Under the weight of authority, insurance contracts have been said to be embraced in this statutory definition of “property.” In re Davis, 730 F.2d 176,184 (5th Cir.1984). For example, even the right to cancel an insurance policy issued to the debtor has uniformly been held to be stayed under section 362(a)(3). Lam, Cancellation of Insurance: Bankruptcy Automatic Stay Implications, 59 Am.Bank. L.J., 267 (1985), (extensively reviewing the cases to this effect). A products liability policy of the debtor is similarly within the principle: it is a valuable property of a debtor, particularly if the debtor is confronted with substantial liability claims within the coverage of the policy in which case the policy may well be, as one court has remarked in a case like the one under review, “the most important asset of [i.e., the debtor’s] estate,” In re Johns Manville Corp., 40 B.R. 219, 229 (S.D.N.Y.1984). Any action in which the judgment may diminish this “important asset” is unquestionably subject to a stay under this subsection. In re Johns Manville Corp., 33 B.R. 254, 261 (S.D.N.Y.1983). Accordingly actions “related to” the bankruptcy proceedings against the insurer or against officers or employees of the debtor who may be entitled to indemnification under such policy or who qualify as additional insureds *1002 under the policy are to be stayed under section 362(a)(3). Ibid.[10]
(c)
The statutory power of the bankruptcy court to stay actions involving the debtor or its property is not, however, limited to section 362(a)(1) and (a)(3). It has been repeatedly held that 11 U.S.C. § 105 which provides that the bankruptcy court “may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title,” “empowers the bankruptcy court to enjoin parties other than the bankrupt” from commencing or continuing litigation. In re Otero Mills, Inc., 25 B.R. 1018, 1020 (D.N.M.1982).[11] In that case, the Court said:
Appellant cites only one case decided under the 1978 Bankruptcy Code which found that the bankruptcy court lacked [under § 105] the power to enjoin parties from pursuing actions against non-bankrupts in state court. In re Aboussie Brothers Construction Co., 8 B.R. 302 (E.D.Mo.1981). In Aboussie, the court did not address § 105(a), but relied on cases decided under the old Bankruptcy Act to hold that there was no jurisdiction to enjoin parties from pursuing actions which did not involve the bankrupt directly. The pre-1978 Act confined jurisdiction to “the debtor and his property, wherever located.” Act of June 22,1938, ch. 575, § 1, 52 Stat. 906 (1938). Under the new Bankruptcy Code, the jurisdictional statute provides that the bankruptcy court shall have jurisdiction “of all civil proceedings arising under title 11 or arising in or related to cases under title 11.” 28 U.S.C.A. § 1471 (Supp.1982). This broader jurisdictional statute, combined with § 105(a), grants the bankruptcy court power to enjoin parties from proceeding in state court against non- *1003 bankrupts where the state proceeding is related to a case arising under Title 11. 25 B.R. at 1020.
In stating the same scope for section 105, the Court in Johns-Manville Corp., 26 B.R. 420, 425 (S.D.N.Y.1983), quoting from 2 Collier on Bankruptcy §§ 362.02 and 362.-05 (15th ed. 1982), put the matter thus:
[Section 362 of the Code] does not attempt to state the jurisdiction of the bankruptcy court with respect to stays and injunctive relief or to determine the boundaries of the exercise of the court’s injunctive power.
Section 105 which is the successor to Section 2A(15), gives the court the power to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title.
[T]he exceptions to the automatic stay of § 362(a) which are set forth in § 362(b) are simply exceptions to the stay which protect the estate automatically at the commencement of the case and are not limitations upon the jurisdiction of the bankruptcy court or upon its power to enjoin. That power is generally based upon § 105 of the Code. The court will have ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process whether in a liquidation or in a reorganization case.
See to the same effect, In Re Landmark, 19 B.R. 556, 559 (N.D.Ohio 1982); In Re Larmar Estates, Inc., 5 B.R. 328, 330-31 (S.D.N.Y.1980).
Accepting that section 105 confers on the bankruptcy court power under its expanded jurisdiction as expressed in section 1471(b) [28 U.S.C.] of the Bankruptcy Reform Act of 1978 and now section 1334(b), 28 U.S.C. of the 1984 Bankruptcy Amendments to enjoin suits against parties in other courts, whether state or federal, it is necessary to mark out the circumstances under which the power or jurisdiction may be exercised. In Otero Mills, supra, the Court approved a ruling that “[t]o so enjoin a creditor’s action against a third party, the court must find that failure to enjoin would effect [sic] the bankruptcy estate and would adversely or detrimentally influence and pressure the debtor through the third party.” 25 B.R. at 1020. In Johns-Manville, the Court phrased somewhat fuller the circumstances when section 105 may support a stay:
In the exercise of its authority under § 105, the Bankruptcy Court may use its injunctive authority to “protect the integrity of a bankrupt’s estate and the Bankruptcy Court’s custody thereof and to preserve to that Court the ability to exercise the authority delegated to it by Congress” [citing authority]. Pursuant to the exercise of that authority the Court may issue or extend stays to enjoin a variety of proceedings [including discovery against the debtor or its officers and employees] which will have an adverse impact on the Debtor’s ability to formulate a Chapter 11 plan. 40 B.R. at 226.
(d)
Beyond these statutory powers under section 362 and section 105 to enjoin other actions whether against the debtor or third-parties and in whatsoever court, the bankruptcy court under its comprehensive jurisdiction as conferred by section 1334, 28 U.S.C., has the “inherent power of courts under their general equity powers and in the efficient management of the dockets to grant relief” to grant a stay. Williford v. Armstrong World Industries, Inc., supra, 715 F.2d at 127, Austin v. Unarco Industries, Inc., 705 F.2d 1, 5 (1st Cir.1983). In exercising such power the court, however, must “weigh competing interests and maintain an even balance” and must justify the stay “by clear and convincing circumstances outweighing potential harm to the party against whom it is operative.” Williford, supra, Metal Center and Seybolt, discussed supra, are illustrative of situations in which courts have found sufficient grounds to grant a stay under this power.
(e)
There are thus four grounds on which the bankruptcy court may enjoin suits *1004 against the bankrupt or its assets and property. In some instances only one of these grounds may be relevant; in an involved and complex case, several or even all of the grounds may require consideration. The present case is such an involved and complex case. It has a striking similarity to a Chapter 11 proceedings, initially begun in the bankruptcy court of the Southern District of New York, concerning the reorganization of the Johns-Manville Corporation. In that proceeding, which was litigated both in the New York and Louisiana courts, many of the issues posed on this •aspect of the case were raised and analyzed by the courts of the two circuits and the decisions resolving such issues present in a practical form the application of the power of a bankruptcy court to stay actions relating to the bankruptcy proceeding against the debtor, its property and their operations. For this reason, it seems pertinent to review the decisions in those proceedings, for their guidance on the resolution of the issue herein. We begin with the initial proceedings in the bankruptcy court of the Southern District of New York.
(f)
Johns-Manville, an asbestos producer, was beset by a mass of suits seeking large awards for damages sustained by reason of asbestos exposure much as has Robins in this case and, after suffering large and burdensome recoveries by plaintiffs and making substantial settlements in many of the cases, filed its Chapter 11 petition in the Southern District of New York in August, 1982. Such filing operated as an automatic stay of all proceedings against Johns-Manville. However, many of the thousands of cases named as defendants not only Johns-Manville but a number of other asbestos producers and dealers as co-defendants. Shortly after Johns-Man-ville filed its Chapter 11 petition, these co-defendants, charged in the complaints of the plaintiffs in the actions as joint tort feasors, sought judicial relief in the bankruptcy court, “inviting,” that court by way of a declaratory judgment in the exercise of “its equitable powers” to enlarge the automatic stay provided by section 362 of the Act to include nondebtor defendants “under the penumbra of section 362’s protection” as well as under section 105, and to extend this stay throughout the nation to all asbestos litigation. Matter of Johns-Manville Corp., 26 B.R. 405 (S.D.N.Y. 1983). The primary issue at this stage was stated to be “whether this Court should take the unprecedented step of exercising its discretion pursuant to section 105 of the Code to extend the section 362 automatic stay so as to encompass the co-defendants herein.” 26 B.R. at 408-409. The bankruptcy court ruled, first, “that section 362 is limited in scope to the debtor and does not operate to stay actions against the co-defendants of this debtor.” 26 B.R. at 409-414. Secondly, it held that relief under section 105 is only available if found to be “necessary or appropriate in order to achieve the goals of a Chapter 11 reorganization,” and, even then, only after a finding that “a failure to enjoin would affect the bankruptcy estate and would adversely or detrimentally influence and pressure the debtor through that third-party,” thereby justifying a finding of irreparable injury and likelihood of prevailing on the merits. None of these facts the court found present on the instant showing, but it added:
In an appropriate case, where the proposed extension of the stay is designed to cover actions against entities that truly are inextricably interwoven with the debtor or which affect property of the debtor’s estate, section 105 may be used. In the instant case, such is not the situation as any liability of these co-defendants is not directly attributable to the debtor as it would be if these co-defendants were, for example, key employees of the debtor. 26 B.R. at 418 (italics in text).
It concluded by declaring that there was “no basis [as shown by the record] to extend the section 362 stay to cover them [the appeals] by means of section 105.”
A second action was begun shortly after-wards, this time by the debtor, to enjoin (1) the prosecution of “proceedings against *1005 Manville’s employees, agents and others” and of discovery proceedings involving them in actions covering “the same issues and subject-matter as are involved in the stayed litigations against Manville,” (2) “ ‘direct action’ lawsuits against insurers and sureties of the debtor”[12] since the coverage of such policies of insurance or suretyship “represent[ed] property of [the debtor’s] estate which must be preserved for the benefit of all creditors,” and (3) a suit brought by certain security holders against “various of the ‘employees, agents and others’ ” in the district court of Colorado. In re Johns-Manville Corp., 26 B.R. 420, 423 (S.D.N.Y.1983). It will be observed that this proceeding involved matters not litigated in the earlier proceeding; in fact, it involved actions against the debt- or’s employees for actions attributable to Manville, precisely the point which the court in the earlier case had said was not before it at that time. The bankruptcy court granted a temporary injunction against the continuance of either the suits or of discovery against present or future officers, employees and agents but refused a stay for past officers and employees. In reaching that conclusion it found that “in great measure the suits being pursued against Manville’s officers and employees are in reality derivative of identical claims brought against Manville,” which, if sustained against the officers and employees, would expose the estate “to claims for contribution and indemnification” and might result in collateral estoppel against the debtor “in subsequent actions.” 26 B.R. at 426. It accordingly held it proper to stay these actions and discovery “against [such] non-debtors which would frustrate the statutory scheme or impact adversely on a debtor’s ability to formulate a plan or on the debtor’s property.” 26 B.R. at 427. It further granted the injunction against the security action, finding “that [such] suit is nothing more than an effort to circumvent section 362 by suing Manville’s officers and directors when the real party in interest is Manville. In all but formal detail, the [security] litigation is against the debtor within the meaning of section 362.” 26 B.R. at 428. It, also, said that:
An adverse judgment in the [security] case would have serious consequences for the debtor’s estate. Manville’s ByLaws require it to indemnify its officers and directors for their litigation expenses, including any amounts paid to satisfy a judgment of liability, so long as the conduct at issue was intended to benefit the company ____ Although Man-ville believes that the insurance policies which it had in force cover these expenses, the insurance company has reserved its right to contest coverage and to terminate on 30 days notice the payment of defense costs. If the insurance company fails to live up to its obligations, the officers and directors would look to the Company for reimbursement pursuant to the By-Laws. In any event, the policies have specific dollar limits beyond which Manville itself must pay. To the extent expenditures related to the (security) suit exhaust those limits, an asset of the estate is diminished and Manville’s exposure in other litigations increases. 26 B.R. at 429.
But it denied a stay of the suits against the insurers and sureties, saying:
Unlike suits against the debtor’s employees and agents, Manville maintains no obligation to indemnify or pay for the defense costs of its insurers or sureties. Thus, the liability of these insurers and sureties in no way inures to the detriment of the Manville estate. 26 B.R. at 431.
On motion for rehearing, however, the bankruptcy court withdrew its decision denying an injunction against suits directed against the debtor’s insurers and granted such injunction. It did so on the basis of these findings:
The debtor “could be adversely affected by the continuation of such suits” *1006 since the “insurance policies and proceeds thereof and the causes of action previously asserted by Manville against its insurance carriers in suits pending in California (“California Insurance Litigation”) and elsewhere constitute substantial property of the Manville estate which will be diminished if and to the extent that third party direct actions against the insurance carriers result in plaintiffs’ judgments” and since “important issues respecting policy coverage and liability may be pressed as collaterally estopping Manville.” 26 B.R. at 435. Further, “[t]o permit the third party actions to continue against Manville’s insurance carriers will result in a multiplicity of positions and defenses on the part of the insurance carriers and will most likely result in inconsistent decisions and rulings concerning the coverage and liability of the insurance carriers to the third party claimants and to Manville. Such a disorganized and fragmented procedure for resolving such major issues will undermine Manville’s attempt at reorganization.” 26 B.R. at 436.
It ended with these legal conclusions:
1. “Manville’s rights under its insurance policies and all the causes of action arising thereunder constitute property of the Manville estates within the purview of section 541(a) of the Code.” 26 B.R. at 436.
2. “Pursuant to § 105(a), the Bankruptcy Court may extend the automatic stay under § 362 of the Code to stay and enjoin proceedings or acts against non-debtors where such actions would interfere with, deplete or adversely affect property of Manville’s estates or which would frustrate the statutory scheme of Chapter 11 or diminish Manville’s ability to formulate a plan of reorganization.” 26 B.R. at 436.
3. Pursuant to § 362(a) of the Code, all actions “to obtain possession of or interfere with property from Manville estates” are stayed and enjoined. 26 B.R. 436.
As a result of action in the Fifth Circuit to which we later advert and in order to enlarge the stay theretofore granted to include past officers and employees, (the court having reached the decision that suits against past as well as present employees of the debtor should be stayed) the bankruptcy court in New York entered a third reported decision in 33 B.R. 254 (S.D.N.Y. 1983). It found that:
In the event of a recovery against the past or present officers, directors or employees of Manville in any of the pending 1,000 cases, Manville’s insurers may be called upon to indemnify such officers, directors and employees under the provisions of the policies issued by them to Manville. If such insurers are called upon to make such indemnification payments, those payments may cause an asset of the Manville estates to be diminished. 33 B.R. at 261.
It reiterated in this same decision its ruling that the insurance policies constituted assets of the debtor, and stated the test for granting a stay or injunction in the circumstances: “(a) possible irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.” It concluded by granting the stay in favor of the insurers and the past as well as present directors, officers and employees, finding that the required findings for a preliminary injunction had been satisfied. 33 B.R. at 262-63.
On appeal of certain of these decisions, the district court affirmed the decisions of the Bankruptcy Court staying discovery of any officers, directors or employees of the debtor and ruled that the provisions of section 362 stayed proceedings against the debtor’s insurers. Specifically, it declared that “the fact that it [Manville] ultimately may not receive all of the proceeds under its products liability insurance does not affect its status as property under the Code subject to the provisions of the automatic stay.” 40 B.R. at 230.
*1007 At the same time that these Johns-Man-ville cases were proceeding in New York, similar issues were arising in asbestos cases filed against Johns-Manville, other joint tortfeasors, and their insurers in the three districts of Louisiana. The three district courts had ruled differently on the right to a stay of all co-defendants of Man-ville, there being no dispute that the stay was proper of Manville itself. On appeal, the Court of Appeals held in Wedgeworth v. Fibreboard, 706 F.2d 541 (5th Cir.1983), that the automatic stay applied only to Manville, not to the other defendants and that the showing as made was insufficient to sustain a stay in favor of the co-defendants under equitable principles; however, it sustained the right of the plaintiffs to amend their complaints to state a “direct action” under the Louisiana statute against Manville’s insurer and held that such an action was not stayed by any provision of the Bankruptcy Act. After a petition for rehearing, however, the Court modified its decision on the plaintiffs’ motion to amend and held “that the district court did not abuse its discretion in declining to permit the plaintiffs to amend their complaints to add, as party defendants, the liability insurance carriers of Johns-Manville and Unar-co.” 706 F.2d at 548. Two days after this decision was filed, the bankruptcy court modified its previous orders by staying “any and all suits against any past, present or future Manville officer, director or employee or against [his or her] insurers.” It added in this order, also, that its prior order would be amended to preclude discovery of the parties against whom suits were proscribed. In an appeal based on a petition for certiorari and for a writ of prohibition against a contempt order against plaintiffs’ counsel for violating such stay, the orders of the bankruptcy court were in effect sustained in In Re Davis, 730 F.2d 176 (5th Cir.1984).
(g)
As we have earlier indicated, we have discussed at some length these proceedings in the Johns-Manville proceedings in New York and Louisiana, because, with their striking similarity both factually and on the legal issues to this case, the decisions of those courts provide persuasive guidance for our action herein. Though the district judge below did not cite the various rulings of the Manville courts in support of his decision, there was a close identity of issues between those in the Manville cases and in the present case. In the three situations in which the defendants have challenged the injunction granted by the district judge [i.e., the Mosa, Conrad and Piccinin cases], the only defendants other than the debtor, are the two Robins, Dr. Frederick A. Clark, Jr., Dr. Hugh J. Davis, and the debtor’s insurer Aetna. So far as the suits against the two Robins and Dr. Clark, those defendants were entitled to indemnification by the debtor under the corporate by-laws and the statutes of Virginia, the State of debtor’s incorporation,[13] and were, in addition, additional insureds under the debtor’s insurance policy. Dr. Davis was the beneficiary of an express contract of indemnification on the part of Robins and was, under a compromise agreement with Robins and Aetna, an additional insured under Robins’ insurance policy. The Manville court had granted a preliminary injunction in favor of defendants in the same position as these defendants, as we have seen, on facts similar to those here, finding that the requirements of possible irreparable harm “had been satisfied *1008 by the showing ... [that the suits against the defendants would represent] an immediate and irreparable impact on the pool of insurance assets, of the existence of sufficiently serious questions going to the merits,” and of the tipping in the defendants’ favor in the hardships in a balancing of the debtor’s and the plaintiffs’. 33 B.R. at 262-63. That court had previously disposed of the public interest being weighted in the debtor’s favor: “Indeed, this Court finds the goal of removing all obstacles to plan formulation eminently praiseworthy and supports every lawful effort to foster this goal while protecting the due process rights of all constituencies.” 26 B.R. at 428.
II.
The district court in this case applied the test for a grant of preliminary injunctive relief as stated by us in Blackwelder Furniture, 550 F.2d 189, 195 (4th Cir.1977), and Televest v. Bradshaw, 618 F.2d 1029, 1032 (4th Cir.1980). It found, as had the Johns-Manville courts, that irreparable harm would be suffered by the debtor and by the defendants since any of these suits against these co-defendants, if successful, would reduce and diminish the insurance fund or pool represented in Aetna’s policy in favor of Robins and thereby affect the property of the debtor to the detriment of the debtor’s creditors as a whole. The likelihood of success by the debtor under these circumstances appeared indisputable. The hardships which would be suffered irreparably by the debtor and by its creditors generally in permitting these plaintiffs to secure as it were a preference in the distribution of the insurance pool herein to which all creditors were entitled, together with the unquestioned public interest in promoting a viable reorganization of the debtor can be said to outweigh any contrary hardship to the plaintiffs. Such was the finding in the Manville cases and that finding does not appear unreasonable here.
The appellants, however, suggest that the record is insufficient to support such findings by the district judge. We disagree. The record is not extensive but it includes every fact considered by the courts in the Manville cases to be necessary for their decision. The rights of Dr. Davis, Dr. Clark and the two Robins to indemnity and their status as additional insureds under Robins’ insurance policy are undisputed on the record. That there are thousands of Daikon Shield actions and claims pending is a fact established in the record and the limited fund available under Robins’ insurance policy is recognized in the record. It seems incontestable that, if the suits are permitted to continue and discovery allowed, any effort at reorganization of the debtor will be frustrated, if not permanently thwarted. It is obvious from the record that if suits are permitted to proceed against indemnitees on claims on which the indemnitees are entitled to indemnity by Robins, either a binding judgment against the debtor will result or, as the court in Metal Center said, inconsistent judgments will result, calling for the exercise of the court’s equitable powers. In our opinion, the record was thus more than adequate to support the district court’s grant of injunctive relief. Certainly, the district court did not commit an abuse of discretion in granting the injunction herein.
The appellants add a final complaining note that the district judge stated in his decision that the “Conclusions of Law” made by him should apply “with equal force to all defendants similarly situated who are brought to the attention of the court.” This is little different, however, from the language of the court in the Man-ville cases in which there was a broad, general injunction against all present or future suits.
In summary, we have no difficulty in sustaining the grant of a preliminary injunction herein. We are sustained in this conclusion by the fact, recognized by the district judge on the record, that any Dai-kon Shield plaintiff may at any time petition for the vacation of the stay as it affects his or her suit and he or she is entitled to a hearing on such petition. Actually, there is one such petition pending and *1009 the district judge has agreed to set a hearing on that petition.
Ill
The second appeal questions the validity of the district court’s order of November 9, 1985, fixing the venue for the trial of all Daikon Shield cases and providing for the transfer of such cases to the District Court of the Eastern District of Virginia at Richmond. Robins has challenged the appéala-bility of such order. We find the challenge without merit.
It is unquestionably true that, as the Court in In Re Amatex Corp., 755 F.2d 1034, 1038-39 (3d Cir.1985), declared, jurisdiction in a Court of Appeals to review a decision or order of a district court sitting in bankruptcy is controlled by § 1291, 28 U.S.C. See also Matter of UNR Industries, Inc., 725 F.2d 1111, 1114-16 (7th Cir. 1984). While section 1291 limits jurisdiction to appeals from “all final decisions of the district courts,” the concept of finality under such statute has traditionally been applied “in a more pragmatic and less technical way in bankruptcy cases than in other situations.” Amatex, supra, at 1039. Judge Breyer in In Re Saco Local Development Corp., 711 F.2d 441, 443-45 (1st Cir.1983) has traced this traditional rule of more liberal construction of finality as applied to appeals in bankruptcy cases over the years. In tracing appealability under the statute in bankruptcy cases, Judge Breyer noted the definition of a “proceeding” in bankruptcy as stated in Taylor v. Voss, 271 U.S. 176, 181, 46 S.Ct. 461, 463-64, 70 L.Ed. 889 (1926), as “not the overall liquidation or reorganization, but rather an individual ‘matter[] of an administrative character ... presented in the ordinary course of the administration of the bankrupt’s estate.” (Emphasis added by Judge Breyer.) He then declared on the basis of this determination that “any dispute between a bankrupt and his creditors over a claim or priority was a separate ‘proceeding’ and an order settling such dispute was appealable.” 711 F.2d at 445. Such is but another practical expression of the princi-pie that “finality” under 1291 is to be given not an absolute and inflexible construction in bankruptcy cases in which a “functional” and “practical” application is to be the rule.
The special or unique reason for this relaxed rule of appealability in bankruptcy is that
[bankruptcy cases frequently involve protracted proceedings with many parties participating. To avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory. In Re Amatex, supra, at 1039.
This particular appeal illustrates well the justification for the relaxed rule of appeala-bility in bankruptcy cases. Should appeal be denied and trials proceed in the district court of the myriad of claims involved with the possibility of reversal on appeal from a final decision in such proceedings, months and months of litigation, carried on at great expense to all concerned might be voided and the reorganization derailed/ with consequent extensive delays both in reorganization and in resolution of the claims of the tort plaintiffs themselves. Weighty considerations of fairness and efficient judicial administration, therefore, mandate appealability in this case. We accordingly dismiss Robins’ challenge to the appealability of the order in question.
Were it necessary, appealability could be sustained under Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546-47, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949), as well as in mandamus. See In re Raison Purina Co., 726 F.2d 1002, 1005 (4th Cir.1984). We, however, prefer to ground our decision on the more relaxed standard of finality for appeal purposes under 1291 traditionally assigned bankruptcy appeals.
Turning to the merits of the appeal on this part of the case, we address first the power of the district court, sitting in bankruptcy, to enter an order fixing the venue *1010 for the trial of tort personal injury claims against the debtor and for transferring all such cases to the bankruptcy court for trial and disposition. Section 157(b)(5), 28 U.S.C. states:
The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.
We do not understand the appellants to contend that under this language the district court did not have authority under this statute to issue an order fixing the venue for trial of tort cases against a Chapter 11 debtor. They do argue, however, that the sense of the section, if not its precise language, was to decentralize the trial of these tort claims and to permit their continuance for trial in the court in which the complaints were filed and that the ruling of the district judge in this case fixing venue in the district court in which the bankruptcy petition was filed flies in the face of this congressional purpose. They refer to the language of Senator Dole in commenting on the Senate Conference Report on the 1984 amendments and construe it as suggesting that tort claims were to be tried in the court in which those claims were originally filed. Senator Dole, in the language to which appellants refer and out of which the appellants arrive at their finding of the sense of the Congress, actually restated simply the language of the statute itself. He said that “where abstention does not occur,[14] those cases [i.e., “personal injury cases”] will be handled by the district court where the bankruptcy has been filed or, if that court finds it appropriate, where the claim arose.” Statement by Hon. Robert Dole 180 Cong.Rec. S 8889 (daily sd. June 29, 1984), reprinted in, 1984 U.S.Code Cong. & Ad.News 586, 587. We discern nothing in that language to warrant the conclusion that, in enacting the statute the Congress favored decentralizing the administration of the bankruptcy by leaving all “personal injury cases” to the court in the place where the claim “arose.” In fact, to accept the view of the appellants on the construction of the statute would be completely at variance with the House version of the bill, which was in effect accepted by the Conference Committee, and would be to adopt the Senate version, which, according to Congressman Kastenmeier’s statement as a House Conference member, was “largely reject[ed]” by the Conference Committee and “would have dissipated the assets of the estate by creating a multiplicity of forums for the adjudication of parts of a bankruptcy case.”[15]
Nor-do we find anything in In re White Motor Credit, 761 F.2d 270, 273-74 (6th Cir.1985), also relied on by the appellants, that lends support to appellant’s construction of § 157(b)(5). The extent of the holding in White Motor was that the district court had the power under the statute to allow products liability cases to be tried where the claim arose; there was nothing in the opinion, however, that declared that such action was mandated or even preferred. Specifically, there was no statement in the opinion that the district court in which the bankruptcy was pending could not try the claim. Unquestionably the district court in this case had the power under the statute to fix the trial venue in its district for all the Daikon Shield cases.
The primary point of difference between the parties, however, relates not so much to the power of the district court in this case to fix venue for all the pending Daikon Shield tort cases — that power is stated in unmistakable terms in section *1011 157(b)(5) — but to the manner in which that power may be exercised. Concededly, section 157(b)(5) does not prescribe any procedure. The appellants suggest that the procedure to be followed is laid out in 28 U.S.C. § 1412, which provides that “[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.” As the appellants correctly construe section 1412, the authority to transfer a suit under that statute rests solely with the court in which the suit is pending and it provides no authority whatsoever to a district court sitting in bankruptcy in one district and having jurisdiction of the bankruptcy to transfer the venue of a case against the bankrupt to another district. Section 157(b)(5), however, expressly confers on the district court sitting in bankruptcy and having jurisdiction of the bankruptcy proceedings the power to fix the venue of any tort case against the debtor pending in other districts. The purpose of this latter statute was, as Congressman Kastenmeier declared, to centralize the administration of the estate and to eliminate the “multiplicity of forums for the adjudication of parts of a bankruptcy case.” 130 Cong.Rec. H 7492, June 29, 1984, reprinted in 1984 U.S.Code Cong. & Adm.News at 579. That purpose would be thwarted and the plain language of section 157(b)(5) nullified if the power of the district court sitting in bankruptcy to fix the venue for tort claims against a debtor was to be preempted by the provisions of section 1412. We do not believe this to have been the intention of Congress in enacting the two statutes. Section 157(b)(5) was drafted to cover the procedure in connection with a special group of cases, to wit, personal injury tort claims against a debtor in Chapter 11 proceedings wherever pending and in that connection the section is supreme. In all other cases related to the bankruptcy proceedings, however, the general statute (i.e., section 1412) would govern. This, we think, is the proper construction to be given the two statutes. It is a construction which harmonizes the two sections. It conforms to that established canon of statutory construction that “[w]e must read the statutes [in those instances where there is any possible conflict] to give effect to each if we can do so while preserving their sense and purpose.” Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981); Columbia Gas v. Federal Energy Regulatory Comm., 651 F.2d 1146, 1158 (5th Cir. 1981); Pennsylvania v. Dept, of Health & Human Resources, 723 F.2d 1114, 1119 (3d Cir.1983). To accept the appellants’ interpretation and to negate the plain language of § 157(b)(5) “would violate the basic principle of construction that statutes should be read, if possible, as harmonious texts.” Leaf Tobacco Exporters Assn. v. Block, 749 F.2d 1106, 1115 (4th Cir.1984). We, therefore, have no difficulty in finding that the district judge’s authority to fix venue of personal injury tort actions against the debtor exists under § 157(b)(5), irrespective of the district in which such controversy is pending.
And there are very real considerations that support a centralization of all the Dai-kon Shield claims, at least at first, in the district court having jurisdiction of the bankruptcy. The “single focal point” of this proceeding is the development of a reasonable plan of reorganization for the debtor, one which will work a rehabilitation of the debtor and at the same time assure fair and non-preferential resolution of the Daikon Shield claims. See In re Towner v. Petroleum Co., 48 B.R. 182, 190 (W.D. Okla.1985). These Daikon Shield claims, asserted by thousands of individuals in courts throughout the United States on behalf of both citizens of this country and citizens or residents of other countries, represent what are characterized in the Act as “contingent or unliquidated claims.” 11 U.S.C. § 502. Ordinarily such claims would be “estimated” by the bankruptcy court as a “core proceeding,” 28 U.S.C. § 157(b)(2), for purpose of allowance if failure to do so “would unduly delay the administration of the case.” 11 U.S.C. § 502(c); 3 Collier on Bankruptcy, § 502.-03 (15 ed. 1982). That duty of estimation in *1012 a proper case under section 502(c) is not a permissive one; it is a mandatory obligation of the bankruptcy court. In re Nova Real Estate Inv. Trust, 23 B.R. 62 (E.D.Va.1982). This customary process of estimation of contingent claims is, however, different where the unliquidated, contingent claims are personal injury tort claims.
Section 157(b)(2)(B) excepts from the definition of “core proceedings” personal tort claims against the debtor. The bankruptcy court thus is without authority under the Act over “the liquidation or estimation of contingent or unliquidated personal injury or wrongful death claims against the estate for purposes of distribution under Title 11” 28 U.S.C. § 157(b)(2)(B). (Italics added) It will be observed, however, that the statute denies authority to the bankruptcy court to “estimate” contingent claims, only if the purpose is to make a “distribution” of the assets of the debtor; the statute does not in express terms deny to the bankruptcy court the authority, or relieve it of the duty, to “estimate” the contingent “personal injury” claims for purposes of determining the feasibility of a reorganization. And such has been the construction of the statute which has been adopted by the courts which have had to face the issue, the two leading cases being proceedings arising out of the asbestos litigation. Roberts v. Johns-Manville Corp., 45 B.R. 823, 825-26 (S.D.N.Y.1984); In re UNR Indus-, tries, Inc., 45 B.R. 322, 326-27 (N.D.Ill. 1984). Both of these cases hold that estimations of the debtors’ potential personal injury tort liabilities as an incident of the development of a plan of reorganization are core proceedings within the bankruptcy court’s jurisdiction and that such estimations are not foreclosed by Section 157(b)(5) of the Act.[16]
This is not to say the personal injury claimants in this proceeding will not be ultimately entitled, if they elect to do so, to have a jury trial of their claim in the district court. Section 157(b)(5) gives them that right. But, even though the tort claimants may be entitled to their jury trials, the bankruptcy court is not relieved of its duty in a Chapter 11 proceeding to estimate those contingent claims. The real question thus arises as to which proceedings takes precedence, whether the estimation by the bankruptcy court of the claims or the jury trials in the district court of the claims. The authorities which have considered this question in connection with a complicated products liability situation such as this are all unanimous. The estimations of the potential and pending claims by the bankruptcy courts should precede any trials of the claims. This was specifically held in the asbestos cases. Roberts v. Johns-Manville Corp., 45 B.R. at 825-26. After all, the first and primary purpose of the proceedings, however, is to ascertain whether a fair reorganization of the debtor can be achieved. This purpose may well be completely thwarted if the energies of the debtor’s executives and officers are initially diverted by, and the resources of the debtor are dissipated in the expenses of litigating, the trial of thousands of personal injury suits in courts throughout the land spread over an interminable period of time. As the Court in Newton v. Johns-Manville Corp., 45 B.R. 827, 830 (S.D.N.Y. 1984), put it, in explaining its decision to proceed in the estimation of the claims *1013 before setting any claim for trial: there is no “sense in ordering a trial of a [tort claimant’s] claim against Manville until a plan has been developed for Manville and until there is reason to believe that the time and expense of potentially 25,000 personal injury trials of the claims against Manville will not deplete the estate and leave other creditors with empty judgments.”
There are 5,000 suits pending against the debtor in this proceeding. There are perhaps an equal number not filed. If all these claims were to be tried, the expense of discovery proceedings and trial would likely consume all the assets of the debtor and exhaust all the resources of its executives and employees. As one court has commented, we “must be mindful of the realities of modern litigation. Pre-trial discovery under modern federal practice has become a monster on the loose____ Pretrial proceedings have become more costly and important than trials themselves.” In re Johns-Manville, supra, 40 B.R. at 224. Since the Daikon Shield litigation began, forty claims have actually been tried but over $517,000,000 have been expended in defending or settling Daikon Shield suits or claims. It is impossible to anticipate the stupendous costs that would be involved if all the claims here had to be tried. If the claimants as a whole are to realize reasonable compensation for their claims, it is obviously in the interest of the class of claimants as a whole to obviate the tremendous expense of trying these cases separately. If the bankruptcy court could arrive at a fair estimation of the value of all the claims and submit a fair plan of reorganization based on such estimation, with some mechanism for dispute resolution and acceptable to all interested parties, great benefit to all the claimants could be achieved and the excessive expense of innumerable trials, stretching over an interminable time, could be avoided.[17] In addition, the real purpose of the proceeding (i.e., a reorganization of the debtor and its continuance as a going business) could be attained.
It is manifest, of course, that the process of estimation will involve some examination of the claims. But this examination will be conducted by the court, will likely not involve duplicative discovery, and can be accomplished expeditiously. It was argued in In re UNR Industries, Inc., 45 B.R. 322 (N.D.Ill.1984), though, that this would require a hearing by the bankruptcy court in making its estimation of the tort claims and accordingly would “not be any more efficient than ordering district court trials.” The court dismissed the argument with this apt comment:
This contention both understates the time and expense of trials and overstates the time and expense of the estimation process. Even should Judge Toles decide the Towers study is insufficient to accurately estimate asbestos claims and that some sort of hearing is necessary, there is no reason to believe 17,000 hearings must be held to get an accurate enough picture of the debtor’s liability to asbestos victims. 45 B.R. at 326.
That language is applicable in this case. It is unlikely that all 8,000 to 10,000 claims which have been filed would have to be tried before an intelligent estimation of the claims could be made by the bankruptcy court. The interests of all the claimants and the public interest in a reasonable and fair reorganization combine in favor of an effort at an estimation of the Daikon Shield claims as a basis for formulating such a plan of reorganization and as a possible step in working out a mechanism acceptable to all the claimants for a dispute-resolution of their claims without burdening the estate with the tremendous expense of endless litigation and reducing if not exhaust *1014 ing, the assets available for paying those claims.
No progress along estimating these contingent claims, however, can be made until all Daikon Shield claims and suits are centralized before a single forum where all interests can be heard and in which the interests of all claimants with one another may be harmonized. Cf. Fidelity Mortgage Investors v. Camelia Builders, Inc., 550 F.2d 47, 55 (2d Cir.1976), cert. denied, 429 U.S. 1093, 97 S.Ct. 1670, 52 L.Ed.2d 372. That undoubtedly was the purpose of the motion to fix venue and to transfer the pending suits to the district court sitting in bankruptcy before which the proceedings were pending. This unquestionably was the idea which prompted the district court to opt tentatively in his order fixing venue in the district court sitting in bankruptcy for all these claims. We approve of the idea and find it conducive of the interests of all concerned.
However persuasive may be the reasons for fixing temporarily at least venue of all the pending suits against the debtor in the district court sitting in bankruptcy where all the other Daikon Shield claims not in suit may be handled together, the question remains as to what procedure must be followed in effecting such change of venue in order to satisfy the requirements of due process. It is the position of the appellants that a right of action in tort is “property” which may not under due process be adversely affected by an involuntary change of venue in the absence of a full hearing after reasonable notice. It may be accepted that, as the appellants argue, a tort claim or action is a “species of property” in the constitutional sense. Logan v. Tim-merman Brush Co., 455 U.S. 422, 428, 102 S.Ct. 1148, 1153-54, 71 L.Ed.2d 265 (1982); cf. Martinez v. California, 444 U.S. 277, 281-82, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980). Similarly, it may be agreed that where the plaintiff has such a claim against a debtor in a Chapter 11 proceeding, he has a statutory right to a jury trial in a district court and that the place of such trial is an important right which may be entitled to some form of due process protection under the broad principles of Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The question is, though, what form such protection must take.
“Due process” does not establish an inflexible standard to be rigorously applied in all cases. Recently, in McClelland v. Massinga, 786 F.2d 1205 (4th Cir.1986), we said that “due process is not ‘a technical conception’ of ‘inflexible procedures’ (citing Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748-49, 6 L.Ed.2d 1230 (1961) nor is it ‘a mechanical instrument’ or ‘yardstick’; it is rather ‘a delicate process of adjustment’ and of a balancing of interests in which it is recognized ‘that what is unfair in one situation may be fair in another____’” In particular, it is important to recognize that the notice and hearing is not “always require[d] ... prior to the initial deprivation of property” and that “[wjhere only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.” Parratt v. Taylor, 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981). We conclude, therefore, that due process requires some form of notice and opportunity for a hearing before there can be a change of venue and before trial of a personal injury tort cause of action against a debtor may be transferred finally from the court in which the cause was initially filed to the district where the bankruptcy proceedings are pending.
We reach this conclusion not only under due process analysis, but also under the language and Rules issued under the Bankruptcy Act. In our opinion, the debtor’s motion herein qualified as a “contested matter” under the Act. As such it had to be begun by the filing of a motion with “reasonable notice and opportunity for hearing ... afforded the party against whom [the] relief [was] sought.” Bankruptcy Rule 9014. The debtor filed with the district court sitting in bankruptcy an *1015 appropriate motion for a fixing of venue and for transfer of tort claims against the debtor, and notice in the manner provided by the Rules in this case was given but only to the Committee of Representatives of Daikon Shield claimants. There was no notice given the individual Daikon Shield claimants who had causes of action against the debtor pending in court. Counsel for the debtor asserted in argument in district court in justification of failure to serve the individual plaintiffs in the tort actions that “in these cases the traditional rule is that you serve the counsel for the Committee, and the Committee, the counsel then has the obligation to bring such matters as are appropriate to the attention of the members of the Committee.” Counsel cited no authority for this “traditional rule.” The Committee, however, contends that notice to it was not notice to the individual claimants and that such notice did not satisfy the notice requirements of Bankrupty Rule 9014 or of due process.
The role of Committees appointed under the Act as revised has received considerable discussion but remains somewhat uncertain. As we have already noted, the status and position of Chapter 11 Committees are thoroughly canvassed in Andrews, The Chapter 11 Creditors' Committee: Statutory Watchdog?, 2 Bankruptcy Developments Journal, 247 (1985). As that article indicates, the Committee’s right to intervene and be heard in any proceeding is, we think, fairly established. Matter of Marin Motor Oil, Inc., 689 F.2d 445, 454-6 (3d Cir.), cert. denied, 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983). In fact, the Rules require that certain notices in the course of the proceedings must be given the Committee. But it seems clear under the Rules that the Committee is not authorized to represent the individual interests of any claimant, as distinguished from the general interests of all claimants, In re Johns-Manville, 26 B.R. 919, 926 (S.D.N.Y. 1983), and only in certain specific situations, no one of which is relevant here, may proper service be made on the Committee rather than on the individual claimants themselves under Bankruptcy Rule 2002(i). It follows that, in our opinion, service of notice of the hearing on the motion to fix venue and to transfer, as given only to the Committee did not represent compliance with Bankruptcy Rule 9014 or with due process.
Conceding that notice to the Committee did not qualify as service on the individual claimants, it does not follow that the absence of such notice may be fatal to due process in this proceeding. The notice to the Committee may have been sufficient under Cleveland Bd. of Education v. Loudermill, — U.S.--,-, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494, 506 (1984), to permit the issuance of a provisional or conditional order providing for a fixing of venue in the district court sitting in bankruptcy for all the pending Daikon Shield cases against the debtor but giving the claimants individual notice and an opportunity to object and to be heard before the order became final in any case where the plaintiff has filed an objection. That procedure would satisfy due process under Parratt and the other cases. And, as we read the record as well as the formal order of the district court, this is precisely what the district court intended, though the language of its order may be obscure on the point.
The district court entered a ruling bringing for the time being all the pending suits against the debtor before the district court sitting in bankruptcy in order to proceed expeditiously in the reorganization but with the definite condition that any party might object and might petition for abstention in his or her case. It was in our opinion intended as a conditional order, though not clearly stated as such. We are of the opinion, because of this possible want of clarity in the order assailed, that such order must be modified to make it crystal clear that the determination of venue therein is, as we have said, conditional, dependent finally and ultimately on a ruling to be made only after notice to all claimants advising them of their right to enter any objections they may have to such a tentative ruling and to submit a motion for *1016 abstention in their particular case.[18] The notice to be given all claimants could be in the form of a letter both to the claimant and to his or her attorney stating the conditional ruling made subject to a final hearing, to become final only after reasonable opportunity given all claimants to object and/or to seek abstention. We would think the notice should fix a time limit for the filing of objections by claimants and should fix a day for a hearing on the objections. The tentative order might be made final as to any claimant who failed to enter an objection within the prescribed time. The mailing of the notice as required will not involve any great expense. Such a modification of the order, followed by a notice in the form suggested, it would seem, should satisfy the requirements of due process and of the Bankruptcy Rules in the unusual circumstances of this case. In order to achieve this modification in the order of the district judge, this phase of the appeal is remanded to the district court for further proceedings in accordance with the opinion herein.
We do not presume to suggest rigid guidelines for the district judge to follow when considering objections to the transfer. We believe it important, however, to observe that although there may be distinct advantages of the tort claims being transferred to Richmond, those advantages should be balanced against the disadvantages that may be advanced at the hearing. In that regard, some cases may be fully prepared and ready for state trial. Some cases may require substantial numbers of local witnesses. Claimants may be receiving critical medical, physical or psychological care in a local area which would have to be halted or transferred to Richmond. All of these factors are relevant. Moreover, there are issues of state law that may substantially affect the results in individual cases.
In summary, we affirm the district court’s order staying the suits of the plaintiffs against the debtor and all co-defendants, but remand with directions the order fixing venue for all pending suits against the debtor and transferring the suits to the district court before which the bankruptcy proceedings were pending.
AFFIRMED IN PART and REMANDED WITH DIRECTIONS.

. For the current FDA regulation on intrauterine devices, see 21 C.F.R. § 310.502 (1984).

. Book Note, 99 Harv.L.Rev. 875 (1986) (reviewing Engelmayer and Wagman, Lord’s Justice: One Judge’s Battle to Expose the Deadly Daikon Shield I.U.D. (1985)).

. In response to that recall, Engelmayer & Wag-man, supra, note 2, at 878, n. 8, state that 4,500 women had removed the shield as of August, 1985, at a cost of $1,600,000.

. Engelmayer & Wagman, supra, note 2, at 876, n. 6, state that of the approximately 7,500 Dai-kon Shield cases settled from 1972 to February 1985, fewer than 40 went to a jury.
A recent article in the Nat.L.J., p. 10, (March 17, 1986), states that by mid 1985, Robins, along with its insurer, Aetna Casualty & Surety Company, “had paid roughly $517 million for 25 trial judgments and 9,300 settlements since the first verdict in 1975.”

. Section 104 of the 1984 Amendments to the Bankruptcy Code provides that "[i]n each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for the district. Each bankruptcy judge ... may exercise the authority conferred under this chapter ... except as otherwise provided by law or by rule or order of the district court."

. For a discussion of the authorization for and responsibilities of such Committees, see Note, The Chapter 11 Creditors' Committee: Statutory Watchdog? 2 Bankr.Dev.J., 247 (1985)).

. In Chatz & Schumm, 1984 Bankruptcy Code Amendments — Fresh from the Anvil, 89 Com. L.J., 317, 319-20 (1984), the authors refer to these two sections as the "critical sections” of the Amendments, establishing as they do what “a bankruptcy court can and cannot do.”

. An order of the Honorable H. Emory Widener, Jr., after a motion for a stay pending appeal, permitted Aetna to intervene. Aetna appears in the appeal.

. This case is generally cited on the strict construction of this subsection.

. There is nothing in In Re White Motor Credit, 761 F.2d 270, 274 (6th Cir.1985) in any way contrary to this conclusion; in fact, it sustains the construction of the statute adopted by us. In White, the parties were in agreement that the products liability insurance was adequate to cover all claims filed but the court cautioned that had this not been so, the result in that case would have been different:
Were it not for the fact that all parties are in agreement that the insurance coverage is adequate to cover all filed claims, it would be necessary to liquidate all claims before any insurance was paid out; otherwise, some claimants would receive an unequal portion of the insurance assets of the debtor.
It is obvious from that statement of the court that White actually sustains the result reached by us that, if the liability insurance is inadequate to satisfy in full all claims under the insurance, the actions by claimants should be stayed and the claims should be "liquidated” in the bankruptcy court.

. There can be no dispute that the Bankruptcy Reform Act of 1978 and like language later in section 1334(b) of the Bankruptcy Amendments of 1984 greatly enlarged the jurisdiction of the bankruptcy courts and were, as stated in the legislative history, intended to "leave no doubt as to the scope of the bankruptcy court’s jurisdiction over disputes.” H.Rep. No. 95-595, 95th Cong.2d Sess. 445, reprinted in 1978 U.S., Code Cong. & Adm.News, 5963, 6401. Those sections provide jurisdiction in the bankruptcy case over any proceedings arising in or related to a title 11 case. The accepted definition of the "related to” in these statutes is that declared in Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir.1984):
An action is related to bankruptcy if the outcome could alter the debtor’s rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.
See also Note, Selective Exercise of Jurisdiction in Bankruptcy-Related Civil Proceedings, 59 Tex. L.Rev. 325, 330-31 (1981):
One can imagine controversies over which the new bankruptcy courts [under 1471(b) ] would have jurisdiction even if neither the debtor nor a representative of the estate were a party, and it is difficult to imagine any instance in which a bankruptcy court would not have jurisdiction if the debtor were a party.
It is true that both Pacor and the Texas Note were referring to section 1471(b) of the 1978 Act. That section, however, was re-enacted in the exact words of the repealed 1471(b) in section 1334(a) and (b) of the 1984 Act. Therefore, "[t]he jurisdiction conferred on the district court [under the 1984 Act’s section 1334(a) and (b) ] is exactly the same jurisdiction that was conferred on the district courts under the Bankruptcy Reform Act [of 1978]." Taggart, The New Bankruptcy Court Systems, 59 Am.Bank. LJ. 231, 239 (1985). To the same effect, King, Jurisdiction and Procedure Under the Bankruptcy Amendments of 1984, 38 Vand.L.Rev. 675, 677 (1985).

. "Direct actions” against insurers are described in Wedgeworth v. Fibreboard Corp., 706 F.2d 541, 546-47 (5th Cir. 1983), and were recognized in Lumbermen’s Mutual Casualty Co. v. Elbert, 348 U.S. 48, 50, 75 S.Ct. 151, 153, 99 L.Ed. 59 (1964).

. It is the accepted practice for corporations such as the debtor to indemnify their directors, officers and employees for the costs of their defense for any judgment rendered against them in such cases. See A.D.M. Corp. v. Thori-son, 707 F.2d 25, 28 (1st Cir.1983); 13 Fletcher, Cyclopedia of the Law of Corporations, § 6045.1 and 6045.3 (1980 ed.). Virginia, the State of the debtor's incorporation, has by statute empowered corporations of that State, by their charter, to provide for such indemnity. Section 13.1-3, 1 Virginia Code; Fletcher, supra, section 6045.-2-235. The charter of the debtor, included in the record, provides such right of indemnification for the directors, officers and employees of the debtor in the broadest sense. As we have seen, a stay in favor of such officers, directors and employees, protected as they are by the right to indemnity from the debtor, and the record in this case shows undisputably that these directors and employees are so protected, was in order.

. “Mandatory abstention under section 1334(c)(2) is not applicable to personal injury claims, but the district court may abstain as a matter of discretion and lift the stay of the state court action.” Taggart, The New Bankruptcy Court System, 59 America Bank.L.J. 231, 253 (1985).

. Statement by the Hon. Robert Kastenmeier, 130 Cong.Rec. H.7492, reprinted in 1984 U.S. Code Cong. & Adm.News at 579.

. Roberts at 826 said:
Even assuming that section 157(b)(5) requires that all personal injury and wrongful death claims be tried in the district courts, the Court does not find that immediate withdrawal and liquidation of Roberts’ claim is appropriate. Section 157(b)(2)(B) does not exclude from the definition of core proceedings estimations of personal injury and wrongful death claims for all purposes. The section is limited to estimation "for purposes of distribution." This leaves estimation for other purposes within the jurisdiction of the bankruptcy court.' See In re UNR Industries, 45 B.R. 322 (N.D.Ill.1984). A trial is not needed, therefore, to satisfy the requirement of section 502(c) that "all claims against the debtor be converted into dollar amounts." (citing Congressional sources). Thus, even if the Code and the 1984 Act require that each and every asbestos claim filed in this eventually be tried, they do not require immediate withdrawal of those claims before a reorganization plan has been confirmed.

. Section 157(b)(5) "does not mandate that all tort actions must be tried in district court, but only those which are not settled otherwise____” Bankruptcy Service, L.Ed. § 2:14.5, at 22 (Supp. 1985) (summarizing Roberts v. Johns-Manville, supra, 45 B.R. at 825-26), and “the parties are certainly free to agree to a dispute-resolution procedure that does not involve trial,” UNR, supra, 45 B.R. at 326. To the same effect is Newton v. Johns-Manville Corp., 45 B.R. 827, 830 (S.D.N.Y.1984).

. Until the conditional order is made final with regard to a particular case, a case should not be physically transferred. Thus, no filing fee shall be paid under Rule 9027 or expenditures accompanying photocopying, freight, etc. be made. Only after an order is final shall the expense of transfer be necessary.