# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-2568

_____

Ritchie Capital Management, L.L.C.;          *
Ritchie Special Credit Investments,          *
Ltd.; Rhone Holdings II, Ltd.;               *
Yorkville Investments, I, LLC; and           *
Ritchie Capital Structure Arbitrage          *
Trading, Ltd.,                               *
                                             *
                                             *
             Appellants,                     *
                                             *    Appeal from the United States
        v.                                   *    District Court for the District of
                                             *    Minnesota.
Mary Jeffries and Camille Chee-Awai,         *
                                             *
                                             *
             Appellees.                      *

_____

Submitted: May 10, 2011
Filed: September 6, 2011

_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

_____

BYE, Circuit Judge.

This case represents a fallout from a $3.65 billion Ponzi scheme perpetrated by Minnesota businessman Thomas J. Petters. Ritchie Capital Management, LLC, and the other appellants (collectively, Ritchie) are investment funds who, like other creditors of Petters and his companies, incurred substantial losses as a result of

participating in Petters's investment scheme. Neither Petters nor his companies are named as defendants in the present action, however. Instead, Ritchie is suing two officers of Petters's companies, Mary Jeffries and Camille Chee-Awai, alleging they assisted Petters in getting Ritchie to loan over $100 million to PGW by representing the loans would be adequately secured by the assets of the Polaroid Corporation. Ritchie's five-count complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), see 18 U.S.C. § 1962(a), (c)-(d), common law fraud, and tortious interference with the contract.

The omission of Petters and his companies from the case caption is not accidental. They were placed in the receivership proceedings, which are still ongoing in the District of Minnesota, and the receivership court prohibited commencement of any new actions "interfer[ing] with the exclusive jurisdiction of [the receivership court] over the assets or documents of Defendants," absent leave of the court. Ritchie thought it could bypass this anti-suit injunction if it sued other individuals who, it alleged, were actively involved in the fraud. The district court disagreed, and dismissed Ritchie's case on account of the receivership court's anti-suit injunction. The present appeal followed.

We find the district court erred in concluding Ritchie's action was barred by the Receivership Order. Considered on a textual level, this order did not bar all actions that merely called for *interpretation* of documents in the receiver's possession unless this exercise ultimately threatened the receivership assets. Nor did the receivership court have the power to cast its anti-suit injunction net that broadly because its equitable powers were circumscribed by its duty to protect the receivership assets. We also reject Jeffries's and Chee-Awai's alternative argument challenging the sufficiency of Ritchie's pleadings in the common law fraud count and choose not to address their arguments related to abstention, lack of causation, and absolute privilege. Accordingly, we reverse the judgment of the district court and remand for further proceedings.

I

*Background Information*.  Understanding this case requires a basic familiarity with the cast of characters involved therein.  The two main companies owned by Petters were Petters Group Worldwide, LLC (PGW) and Petters Company, Inc. (PCI).  "PCI was the venture capital arm of the Petters enterprises that utilized single purpose entities to obtain billions of dollars of funding, purportedly to acquire merchandise for sale to wholesalers and retailers nationwide.  PGW held investments in numerous companies, and its principal asset was its stock in Polaroid."  Ritchie Special Credit Invs., Ltd. v. U.S. Trustee, 620 F.3d 847, 850 (8th Cir. 2010).  Polaroid Corporation, whose assets were coveted by Ritchie, was indirectly a wholly-owned subsidiary of PGW.  The two defendants named in the present case are Mary Jeffries, the President of PGW, the Chief Operating Officer of PGW and PCI, and the Chief Executive Officer of Polaroid, and Camille Chee-Awai, the Chief Executive Officer of Petters Capital, LLC, PGW's subsidiary.

According to Ritchie, Jeffries and Chee-Awai conspired with Petters, "the principal conspirator," Compl. ¶ 1, to induce Ritchie to loan PGW well over $100 million and then deprive it of its security interest in Polaroid.  In making its decision to provide financing to PGW in February 2008 and then to extend maturity dates on the notes in May through September 2008, Ritchie allegedly relied on Jeffries's and Chee-Awai's representations as to the existence, value, and exclusivity of its security interest in Polaroid and the legitimate nature of Petters's businesses in general.  Interpreting Illinois law to allow for creation of a valid security interest on the basis of oral agreements alone, Ritchie relies on these representations to assert a security interest in Polaroid assets dating back to Ritchie's first loan to PGW on February 1, 2008.

Yet, Ritchie apparently did not believe in the power of a written word.  Rather than demanding from Petters a full-fledged written commitment regarding the

-3-

security interest in Polaroid from the beginning, Ritchie extended its first $31 million loan on the strength of Petters's personal guaranty alone. Then, on February 19, 2008, Ritchie entered into the Note Purchase Agreement with Petters and PGW, in which Petters also agreed to "endeavor, as soon as reasonably practicable, to secure this Note . . . by a pledge of 100% of the capital stock of Polaroid." Compl. ¶ 58. Ritchie's interest in certain Polaroid assets was finally memorialized on September 19, 2008, when Ritchie and Petters executed agreements extending maturity dates on certain notes evidencing PGW's obligations to Ritchie. Because Polaroid was placed under the bankruptcy protection less than three months later, however, that formal grant of the security interest might prove to be too little too late. This is so because it is vulnerable to being attacked as a preferential transfer.

*Receivership Action*. On September 24, 2008, just five days after Ritchie got Petters to formally assign the security interest in Polaroid, the federal authorities executed search warrants at PCI's premises and at Petters's house. On October 2, 2008, the government commenced an action pursuant to the Fraud Injunction Statute, 18 U.S.C. § 1345, to preserve the assets held by PCI, PGW, and other related entities, including Polaroid, in the event they are ordered to pay restitution to the victims of the alleged fraud scheme. See United States v. Petters, No. 08-5348 (D. Minn. 2008) (Montgomery, J.). Pursuant to the parties' stipulation, the court entered the preliminary injunction freezing the assets of the named defendants and appointing Douglas Kelley as a Receiver, with broad powers of custody, control, and possession of the receivership entities' assets. The court retained exclusive jurisdiction of the matter for all purposes, and enjoined "[a]ny and all actions that would interfere with the exclusive jurisdiction of this Court over the assets or documents of Defendants." Appellant App'x at 96-97. The anti-suit provision of the order was phrased rather broadly and by its terms applied to third parties:

> [E]xcept by leave of this Court, during pendency of the receivership ordered herein, Defendants, and all investors, creditors,

stockholders, lessors, customers and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such persons (except the Receiver), are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the assets or documents of Defendants, including but not limited to:

. . .

D. Initiating any other process or proceeding that would interfere with the Receiver's managing or taking custody, control or possession of the assets or documents subject to this Receivership[.]

Appellant App'x at 95-96.

Twice after the Receivership Order was entered, Ritchie sought to intervene, urging the receivership court to exempt PGW and its wholly-owned subsidiary Polaroid from the asset freeze. Both times, the district court disallowed the intervention on account of untimeliness and failure to establish the denial of intervention would impair Ritchie's ability to protect its interests. The Eighth Circuit affirmed the rulings. See United States v. Ritchie Special Credit Invs., Ltd., 620 F.3d 824 (8th Cir. 2010).

*Criminal Action*. In December 2008, a federal grand jury returned an indictment against Petters, PCI, and PGW on charges of mail fraud, wire fraud, money laundering, and conspiracy to commit the same offenses. Petters was convicted of the twenty charges against him and sentenced to fifty years' imprisonment. The appeal from his convictions and sentence is currently pending before this court. See United States v. Thomas Petters, No. 10-1843 (8th Cir., argued Feb. 17, 2011).

*Polaroid's Bankruptcy Action*. On December 18, 2008, the Receiver filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (later converted into Chapter 7) on behalf of Polaroid, among other Receivership entities. See In re

Polaroid Corp., No. 08-46617 (Bankr. D. Minn., filed Dec. 18, 2008). Kelley was appointed as Chapter 11 trustee for PGW and PCI.[1] In that capacity, Kelley commenced an adversary proceeding against Ritchie seeking to set aside Ritchie's liens against Polaroid as fraudulent and preferential transfers. In this proceeding, he maintained that "literally days before or after the Ponzi scheme collapsed, Ritchie . . . orchestrated a series of transactions targeted at securing the value of Polaroid and other assets owned or controlled by Thomas Petters in a final-hour attempt to shore up, conceal and cover millions of dollars in losses." Appellees App'x at 116.

Ritchie vigorously disputed Kelley's account of events. It countered Polaroid was never in need of bankruptcy protection and "Jeffries's and Kelley's sole purpose in placing Polaroid into bankruptcy was a bad faith attempt to void [Ritchie's] (and others') security interests in Polaroid." Compl. ¶ 109. In the adversary-proceeding counterclaim, Ritchie sought a declaration that its security interest in certain Polaroid assets was valid, advancing many of the same allegations that are raised in the present complaint.

The bankruptcy court authorized the sale of Polaroid assets unencumbered by Ritchie's lien, but provided for attachment of Ritchie's lien, to the extent it is determined to be valid, to the proceeds of the sale. According to Ritchie's complaint in the present case, the bankruptcy court allowed the sale to proceed based, in part, on the sworn affidavit of Jeffries averring that "Ritchie invested at least $146 million into PCI as part of the fraudulent Ponzi scheme," and that "at no time did Ritchie invest in, or advance any funds to Polaroid or to PGW for that matter." Compl. ¶ 111. In exchange for her "cooperation with Kelley's plans to forfeit PGW's assets to the

_____

[1]Ritchie objected to Kelley's appointment as a trustee, arguing his role as a Receiver in the receivership action disqualified him from the appointment as a common trustee of the jointly administered estates in the bankruptcy court. The bankruptcy overruled Ritchie's objection, and this court affirmed. Ritchie Special Credit Invs., Ltd., 620 F.3d at 856.

-6-

Government," Ritchie's theory proceeds, Jeffries was allowed to retain a million-dollar bonus she had received from PCI. Compl. ¶ 112.[2]

Polaroid's adversary complaint against Ritchie and one of Ritchie's two counterclaims against Polaroid remain pending in the bankruptcy court, awaiting the decision on a motion for summary judgment filed by the Trustee.

*District Court Proceedings*. Unable to intervene in the receivership action and not having much luck in the bankruptcy forum, Ritchie filed this case alleging RICO violations, common law fraud, and tortious interference with a contract against Jeffries and Chee-Awai. The defendants moved to dismiss the case claiming, among other things, that the anti-suit provision in the Receivership Order barred Ritchie's action. The district court agreed, noting:

> [I]t is obvious that the gravamen of th[e] Complaint alleges [PGW] in conjunction with the defendants fraudulently induced them to extend loans in exchange for Polaroid's security interests. In order to address the plaintiffs' claim, this Court would necessarily be required to consult and interpret Petters Group Worldwide's loan documents and financial statements, documents expressly governed by the Receivership Order, and specifically mentioned in the plaintiffs' complaint.

Appellant App'x at 73-74.

---

[2]Since Ritchie had filed its opening brief, Kelley, acting as a trustee in the PCI bankruptcy case, commenced clawback actions against both Jeffries and Chee-Awai requesting disgorgement of all proceeds received through the operation of the Ponzi scheme. See Kelley v. Jeffries, No. 10-4400 (Bankr. D. Minn., filed Oct. 8, 2010); Kelley v. Chee-Awai, No. 10-4398 (Bankr. D. Minn., filed Oct. 8, 2010).

II

We review the district court's dismissal of Ritchie's action de novo, taking all facts alleged in the complaint as true. Trooien v. Mansour, 608 F.3d 1020, 1026 (8th Cir. 2010). To the extent Ritchie challenges the receivership court's authority to enter the anti-suit injunction, we review the receivership court's exercise of power for abuse of discretion. SEC v. Hickey, 322 F.3d 1123, 1128 (9th Cir. 2003); see also Liberte Capital Grp. v. Capwill, 462 F.3d 543, 551-53 (6th Cir. 2006) (emphasizing the breadth of the receivership court's powers in entering an anti-suit injunction).

A

In deciding whether the anti-suit injunction in the Receivership Order prevents this litigation, we start with its text. The provision in question applies to "all investors, creditors . . . seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants," among other classes of people. Appellant App'x at 95. Because "Defendants" in the receivership case include PGW and "any affiliates, subsidiaries, divisions, successors, or assigns owned 100% or controlled" by the receivership defendants, Appellant App'x at 80, creditors seeking to establish an interest in Polaroid, PGW's wholly-owned subsidiary, fall within the purview of this clause. Ritchie is one of such creditors.

This is not the end of our textual analysis, however. Even suits affecting the receivership defendants do not run afoul of the anti-suit injunction unless they "interfere with the Receiver's managing or taking custody, control or possession of the assets or documents subject to this Receivership." Appellant App'x at 96. The parties agree Ritchie's action against Jeffries and Chee-Awai does not interfere with the assets of the receivership as such, but disagree on what it means to "interfere with the Receiver's managing or taking custody, control or possession of . . . documents subject to this Receivership." While Ritchie argues for a literal interpretation of the

-8-

phrase focusing on the Receiver's physical possession of the documents, Jeffries and Chee-Awai urge a more functional approach encompassing not only physical possession of the receivership documents but also their interpretation.

We think Ritchie's view is more loyal to the text of the Receivership Order. Quite simply, the order does not mention the *interpretation* of the receivership documents as one of the evils it was intended to prevent. Jeffries's and Chee-Awai's suggested construction would require the court to read the new word into the sentence without any sign the court intended it to be there. Cf. Jung v. Gen. Cas. Co. of Wisconsin, ___ F.3d ___, 2011 WL 3444566, at *3 (8th Cir. 2011) (refusing to "read[] a requirement into the statute that simply is not there").

Nor does the suggested construction fit in the overall scheme of the sentence. See United States v. Stanko, 491 F.3d 408, 416 (8th Cir. 2008) (describing the maxim of *noscitur a sociis*, under which "a word is known by the company it keeps") (internal quotation marks and citation omitted). The syntactic function of the noun "documents" is the same as that of the noun "assets" – both are indirect objects following the words "Receiver's managing or taking custody, control or possession." Accordingly, the interpretation of the sentence suggested by Jeffries and Chee-Awai would translate into the court's monopoly over the interpretation of all documents in the Receiver's management, custody, control, or possession. It would drastically expand the scope of the anti-suit injunction to prevent suits between unrelated parties, regardless of their effect on the receivership assets, whenever a suit calls for the interpretation of the documents which happened to be in the possession of the receivership entity. We think such interpretation goes too far.

Rather, we read the sentence to prohibit physical interference with documents in the Receiver's management custody, possession or control, in whatever medium. Interpreting interference with documents in a physical sense is also consistent with the receivership court's directive to stay all civil discovery while the preliminary

injunction is in effect. Of course, if the interpretation of documents has the potential of affecting the Receiver's "managing or taking custody, control or possession" of the receivership assets, the case would fall within the anti-suit injunction by virtue of its interference with the receivership assets. This is not the case here, since none of the receivership defendants are named in the suit. And since no party argues the present action interferes with the Receiver's possession of any documents literally, Ritchie's suit is not foreclosed by the anti-suit injunction in the Receivership Order.

B

Even if we set aside the textual interpretation of the Receivership Order, we are skeptical of the receivership court's power to preempt all actions calling for the interpretation of "documents subject to this Receivership." Whatever the precise scope of this category of actions, it is significantly broader and more amorphous than the group of actions affecting the assets of the receivership. A federal court supervising an equity receivership has inherent equitable authority to issue a variety of ancillary relief to protect the receivership and, true enough, the scope of that relief is not limited to parties before the court. SEC v. Wencke, 622 F.2d 1363, 1369-71 (9th Cir. 1980). Permissible ancillary relief includes issuance of orders imposing blanket stays of litigation, in order to give the receiver "a chance to do the important job of marshaling and untangling a company's assets without being forced into court by every investor or claimant." United States v. Acorn Tech. Fund, LP, 429 F.3d 438, 443 (3d Cir. 2005). But the court's power to stave off suits by third parties turns on these suits' ability to deplete the res of the receivership estate. SEC v. Byers, 609 F.3d 87, 93 (2d Cir. 2010); Liberte Capital Group, LLC, 462 F.3d at 551-52. The court's equitable powers do not reach cases that pose no threat to the assets of the receivership. Cf. SEC v. Cherif, 933 F.2d 403, 413-14 (7th Cir. 1991) (holding provisions of the Securities Exchange Act of 1934 construed to authorize the court to grant equitable relief necessary to effectuate the purposes of the Act, see 15 U.S.C.

-10-

§ 78u(d), (e), do not authorize the freeze on the assets of a non-party who has not been accused of violating any securities laws).

In this respect, equitable powers of the receivership court are similar to powers of the bankruptcy court to impose an automatic stay pursuant to 11 U.S.C. § 362(a). "The goal in both securities-fraud receiverships and liquidation bankruptcy is identical – the fair distribution of the liquidated assets." SEC v. Wealth Mgmt. LLC, 628 F.3d 323, 334 (7th Cir. 2010). The bankruptcy court can stay actions against any party, even a non-debtor, whenever the objective of the action is to obtain possession or exercise control over the debtor's property. See 11 U.S.C. § 362(a)(3). Unless a case involves unusual circumstances, however, the bankruptcy court cannot halt litigation by non-debtors, "even if they are in a similar legal or factual nexus with the debtor." Croyden Assocs. v. Alleco, Inc., 969 F.2d 675, 677 (8th Cir. 1992) (quoting Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1205 (3d Cir. 1992)); Sav-A-Trip, Inc. v. Belfort, 164 F.3d 1137, 1139 (8th Cir. 1999).

The unusual circumstances in which the bankruptcy court can stay cases against non-debtors are rare. Reliant Energy Serv., Inc. v. Enron Canada Corp., 349 F.3d 816, 825 (5th Cir. 2003). They typically arise where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." McCartney v. Integra Nat'l Bank N., 106 F.3d 506, 510 (3d Cir. 1997) (internal quotation marks and citation omitted); see also A.H. Robins Co. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986) (indicating a stay under § 362(a)(1) may apply to non-debtor where, for example, a third party is entitled to absolute indemnity by the debtor on account). In other words, the automatic stay will apply to non-debtors only when "a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate."

-11-

Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282, 287-88 (2d Cir. 2003) (listing actions as debtor's guarantors or insurers as examples of permissible orders of stay against non-debtors).

The unusual-circumstance exception is not implicated where, as here, the new litigation has no potential impact on the bankrupt entity. Because no receivership defendant is named in Ritchie's action and none is in privity with Jeffries or Chee-Awai, the court's findings in the present case cannot have a binding effect on Petters or other receivership defendants. Tyus v. Schoemehl, 93 F.3d 449, 453 (8th Cir. 1996), abrogated on other grounds by Taylor v. Sturgell, 553 U.S. 880 (2008). Thus, just like the bankruptcy court could not stay Ritchie's action under § 362, the receivership court had no power to prevent Ritchie's suit from going forward.[3]

III

Reasoning in the alternative, Jeffries and Chee-Awai attack the common law fraud count in Ritchie's complaint on the grounds it fails to plead that Jeffries and Chee-Awai had no intention to grant Ritchie the security interest in Polaroid prior to

---

[3]This is not to say the district court could not decide to dismiss or stay Ritchie's action on remand to avoid duplicative litigation. Independent from any power of the receivership court to forestall prospective actions by third parties, the district court has the authority to refuse to hear this case if it raises issues that substantially duplicate those raised by a case pending in another court. See United States v. Rice, 605 F.3d 473, 476 (8th Cir. 2010) (citing Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)); Orthmann v. Apple River Campground, Inc., 765 F.2d 119, 121 (8th Cir. 1985) (adopting the first-to-file rule); see also Cadle Co. v. Whataburger of Alice, Inc., 174 F.3d 599, 603 (5th Cir. 1999). Because the district court is "ordinarily better positioned than [the court of appeals] to weigh and balance" abstention-related factors, Burnett v. Physician's Online, Inc., 99 F.3d 72, 76 (2d Cir. 1996), we express no view on the propriety of dismissing or staying the action on abstention grounds.

Ritchie's decision to extend the first loan.[4]  Ritchie had to plead the absence of intent, the argument goes, because its theory of common law fraud was based on misrepresentations as to a future act.

As an initial matter, it is unclear whether Jeffries and Chee-Awai attack the complaint under Rule 9(b) or Rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Arazie v. Mullane, 2 F.3d 1456, 1464-65 (7th Cir. 1993) (treating the two standards as different); but see Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 125 (2d Cir. 2001) (noting that, since Rule 9(b) does not authorize a motion to dismiss, courts have used Rule 12(b)(6) to enforce its standards).  If it is the former, there is no doubt Ritchie's complaint satisfies the requirement to plead "the who, what, when, where, and how: the first paragraph of any newspaper story." Summerhill v. Terminix, Inc., 637 F.3d 877, 880 (8th Cir. 2011) (internal quotation marks and citation omitted).  The complaint is fifty pages in length, and includes factual details of the alleged fraudulent plot, including individuals involved, dates when the alleged misrepresentations took place, and the medium over which they occurred.  These allegations fulfill the goal of Rule 9(b) to "enable the defendant to respond specifically and quickly to the potentially damaging allegations," United States ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006) (internal quotation marks and citation omitted), and Rule 9(b) requires nothing more.

---

[4]Jeffries and Chee-Awai also argue the count fails to allege a sufficient causal connection between their representations and Ritchie's decision to extend the loans where Ritchie settled for a personal guaranty from Petters in executing a written agreement.  Because Jeffries and Chee-Awai did not properly raise this issue in the district court (they mention it for the first time in their reply brief), we decline to address it.  McClain v. Am. Economy Ins. Co., 424 F.3d 728, 734 n.2 (8th Cir. 2005).  We likewise refuse to address the merits of Jeffries's and Chee-Awai's absolute privilege argument mentioned in their brief only by way of a footnote.  Koehler v. Brody, 483 F.3d 590, 599 (8th Cir. 2007).

Jeffries's and Chee-Awai's challenge fares no better if it is interpreted as an attack on Ritchie's complaint in a traditional Rule 12(b)(6) sense. It is indeed black-letter law that a "representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention" at the time he makes the misrepresentation. <u>See</u> Restatement (Second) of Torts § 530(1); <u>see also</u> <u>Vandeputte v. Soderholm</u>, 216 N.W.2d 144, 147 (Minn. 1974) (stating a representation as to future acts is not actionable unless the promisor had no intention to perform at the time the promise was made). However, under Rule 9(b) applicable to common law fraud claims, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); <u>see</u> <u>In re 2007 Novastar Fin. Inc., Secs. Litig.</u>, 579 F.3d 878, 882 (8th Cir. 2009) (stating that, in contrast to actions brought under the Private Securities Litigation Reform Act, regular fraud claims are subject to the pleading standards of Rules 8(a) and 9(b) only). The court must draw reasonable inferences in favor of the nonmoving party, and the motion to dismiss under Rule 12(b)(6) is appropriate only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Moses.com Secs., Inc. v. Comprehensive Software Sys., Inc.</u>, 406 F.3d 1052, 1062 (8th Cir. 2005) (internal quotation marks and citation omitted).

Ritchie's complaint satisfies these requirements. It opens with the allegation that Petters, Jeffries and Chee-Awai entered into a "fraudulent scheme . . . to deprive the Plaintiffs . . . of the benefits of valuable security interests in one of the world's most-recognized companies, Polaroid Corporation ('Polaroid')." Compl. ¶ 1. "After Plaintiffs made the loans," the complaint continues, "Defendants and their co-conspirators schemed to defraud Plaintiffs out of the benefit of those security interests." <u>Id.</u> After enumerating various communications between Ritchie, Petters, Jeffries, and Chee-Awai, the complaint recaps:

> 50. In early 2008, the global credit crisis caused Petters and the defendants to experience difficulty in obtaining additional financing. By early February 2008, this lack of new capital led Petters to use Polaroid

-14-

to attract additional money. Knowing that Polaroid had been pledged to Plaintiffs, Defendants engaged in an elaborate scheme to delay and deprive Plaintiffs of the benefits flowing from their bargained-for security interests in Polaroid so that they might obtain additional funds from other lenders by fraudulently re-pledging the Polaroid assets.

. . .

58. Almost immediately [after JPMorgan's loan was paid off], Defendants began a game of "keep away" in connection with the Plaintiffs' bargained-for interests. On February 19, 2008, Plaintiffs entered into the Note Purchase Agreement with Petters and PGW covering Plaintiffs' $31 million loan and other loans made by Plaintiffs and related investment funds. Although the JPMorgan lien on the Polaroid stock and assets had been released, Petters remained personally obligated on the loans. In addition to PGW's promise to grant a security interest in Polaroid as collateral for Plaintiffs' loans, the note evidencing Plaintiffs' $31 million loan to PGW also contained the following clause:

> This Note is guaranteed personally by Thomas J. Petters, the owner of all of the issued and outstanding stock of the Borrower; provided, however, that the parties shall endeavor, as soon as reasonably practicable, to secure this Note (along with all other Notes of this tranche, pari passu) by a pledge of 100% of the capital stock of Polaroid Holding Company, LLC and the capital stock of its one hundred percent subsidiary the Polaroid Corporation . . . .

59. Unbeknownst to Plaintiffs, Petters and Defendants had no intention to "endeavor" to pledge to Plaintiffs the capital stock of Polaroid Holding Company, LLC or Polaroid Corporation.

Compl. ¶¶ 50, 58-59.

Paragraph 59 of its complaint alleges Petters, Jeffries, and Chee-Awai had no intent to "endeavor" to pledge the capital stock of Polaroid to Ritchie. Jeffries and Chee-Awai acknowledge this paragraph "comes close" to satisfying the intent-at-the-time-of-promise element of fraud, but contend it relates only to the intent of

-15-

coconspirators as of February 19, 2008, when Ritchie entered into the Note Purchase Agreement with Petters referenced in the preceding Paragraph 58. While the text of Paragraph 59 uses the same word "endeavor" that was used in the February 19, 2008, agreement referenced in Paragraph 58, it does not on its face contain any temporal limitations. There is likewise no temporal limitation in count four of the complaint, which charges Jeffries and Chee-Awai "schemed to deprive Plaintiffs of the benefits of those security interests in Polaroid by fraudulently concealing . . . Defendants' and their co-conspirators' plans to pledge and the pledge of Polaroid as collateral to obtain from third parties funds and other benefits for Polaroid, PGW and/or PCI." Compl. ¶ 140. Combined, these allegations support an inference that Jeffries and Chee-Awai never intended to pledge Polaroid as collateral for Ritchie's loans.

Attempting to dispel this inference, Jeffries and Chee-Awai point to the complaint allegation stating, "[a]fter one of Plaintiffs' funds wired the initial $31 million to pay JPMorgan, Defendants and their co-conspirators initiated a scheme to deprive Plaintiffs of the benefits of their security interest in Polaroid." Compl. ¶ 4. We do not read this statement as antithetical to the inference that Jeffries and Chee-Awai had no intent to act on their promises from the beginning of their dealings with Ritchie. Rather, the statement focuses on a different time frame – it relates to the parties' actions after obtaining the first loan – and is intended to underscore the validity of Ritchie's security interest in Polaroid once it extended the first loan to PGW. As a final point, we also observe the common-law fraud count rests not only upon Jeffries's and Chee-Awai's misrepresentations prior to February 1, 2008, but also upon their misrepresentations in the months that followed. It is in reliance on these misrepresentations, argues Ritchie, that it extended additional loans to PGW and granted additional extensions on the maturity dates of these loans. In sum, we find no merit in Jeffries's and Chee-Awai's alternative argument.

## IV

For these reasons, we reverse the judgment of the district court and remand for further proceedings.

_____