# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1900

_____

| | | |
|---|---|---|
| In re: Panther Mountain Land Development, LLC, | * | |
| | * | |
| | * | |
| Debtor, | * | |
| | * | |
| ----------------------------- | * | |
| | * | |
| National Bank of Arkansas, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the Bankruptcy |
| v. | * | Appellate Panel for the |
| | * | Eighth Circuit. |
| Panther Mountain Land Development, | * | |
| LLC, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| The Holloway Firm, Inc. | * | |

_____

Submitted: February 15, 2012
Filed: July 25, 2012

_____

Before LOKEN, BYE, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Voluntary Chapter 11 Debtor Panther Mountain Land Development, LLC (the Debtor), holds certain parcels of undeveloped land that are included within property-owners' improvement districts (the Improvement Districts) formed in accordance with Arkansas law. The Debtor formed the Improvement Districts more than one year before filing for bankruptcy. They are separate, pseudo-governmental entities with certain powers including the abilities to sue or be sued, incur expenses for development purposes, and impose priority liens on properties included within the districts.

More than one year after the Debtor entered into bankruptcy, secured creditor National Bank of Arkansas (the Bank) filed a motion with the bankruptcy court seeking a ruling that a proposed state court action against the Improvement Districts would not violate the automatic stay. The Bank alleged the districts were formed without constitutionally required notice that the Bank's collateral (the land referenced above) would be included within the districts. The Bank's motion was its fourth motion for relief from the stay, although it was the first motion concerning the Improvement Districts. The Bank filed the motion while a potential sale of a portion of the collateral was pending.

The bankruptcy court determined that the automatic stay applied to the Bank's proposed action and that relief from the stay was unwarranted. The bankruptcy court, acting *sua sponte*, also determined that the Bank's motion was barred by laches and that the Bank's attorneys had not filed the motion in good faith. The Bank appealed to the Eighth Circuit's Bankruptcy Appellate Panel (the BAP), which affirmed as to the applicability of the automatic stay. The BAP did not address the issues of laches or bad faith.

The Bank appeals to our court, and we reverse. The automatic stay does not apply to the Bank's proposed action against the Improvement Districts, which are neither property of the Debtor nor debtors themselves. The Bank's action against the

Improvement Districts will have the potential consequence only of impacting the value of the estate in some undetermined and indirect manner; it is not an action to gain possession of, or exercise control over, estate property. The action will neither divest the Debtor of its property nor is there any evidence suggesting the action is likely to so substantially diminish the property's value as to effectively divest the Debtor of its property. Further, the equitable doctrine of laches does not apply in this situation because there has been no showing of detrimental reliance by the Debtor upon the Bank's failure to raise this particular challenge in a more timely fashion.

I.

The Bank holds mortgages on a 125-acre undeveloped parcel of land referred to as Sunset Lake Estates (the Sunset Lake Parcel) and on 17 lots in a development the parties refer to as the Panther Mountain subdivision (the Lots). The Debtor owns this land, and the mortgages secure two notes totaling approximately $1.9 million. As of October 2010, the Debtor owed the Bank approximately $2.1 million.

Throughout the spring of 2008, the Debtor formed the Improvement Districts in accordance with Arkansas law. Arkansas statutes provide for at least two different types of improvement districts: property-owners' improvement districts and municipal improvement districts. See Ark. Code Ann. §§ 14-93-101 to 133 & 14-94-101 to 128. The Improvement Districts at issue in the present case are the former, although property-owners' and municipal improvement districts share several characteristics. We discuss the detailed powers and characteristics of property-owners' improvement districts in our analysis below. In general, they are separate, quasi-governmental corporate entities that affect the land included within the districts. Id. § 14-93-112. They are formed by county courts in Arkansas and require unanimous petition of the recorded title holders of all land to be included within such districts. Id. § 14-93-105 to 106.

Property owners' improvement districts are controlled by a board of three commissioners who are named by the county court. Id. § 14-93-107 to 109. The commissioners of the Improvement Districts in the present case are Barry and Dana Kellerman and their daughter. Barry Kellerman and Dana Kellerman own and control the Debtor; the Debtor in the present case is not a commissioner.

In November 2008, the Bank initiated a foreclosure action, and in September 2009, the Debtor filed for bankruptcy. The next day, the Bank filed a first motion for relief from the automatic stay seeking to continue its state-court foreclosure action. The bankruptcy court held hearings regarding the value of the Bank's collateral, rejected testimony from the Bank's appraiser, and determined that the Bank enjoyed a sufficient equity cushion to justify denying the Bank's first motion for relief.

In April 2010, the Bank filed a second motion for relief from the automatic stay and a motion to set the property value for valuation of secured claims. The bankruptcy court held hearings on the second motion on three days during August 2010. On the last day of hearings, the Bank filed a third motion for relief from the automatic stay, asserting a claim that the bankruptcy was a single asset real estate case and seeking relief in accordance with that claim.

On September 9, 2010, before the bankruptcy court had ruled on the second motion for relief and before the court had held hearings on the third motion for relief, the Debtor filed a motion for authority to sell 45 acres of the 125-acre Sunset Lake Parcel to ERC Land Development, LLC (ERC). The planned sale to ERC and the proposed contract documents surrounding that sale required the Debtor to assign rights in the Improvement Districts to ERC.[1]

---

[1]The proposed contract provided:

At the Closing, . . . Seller shall deliver to Buyer . . . an assignment of all rights in any improvement districts . . . which incorporate the Land . . . ;

-4-

On September 17, 2010, the Bank filed an objection to the motion to sell, and on September 23, the Bank filed its fourth motion for relief from the automatic stay. This fourth motion for relief was the present motion seeking a declaration that the stay would not apply to a proposed state court action against the Improvement Districts. In the proposed state court action, the Bank asserts that, when forming the Improvement Districts, the Debtor did not provide notice to the Bank that the Bank's collateral would be included in the districts. Although it is now undisputed that Arkansas statutes do not expressly require such notice, the Bank asserts that the Due Process clause of the Fourteenth Amendment of the United States Constitution and Section 21, Article 2 of the Arkansas Constitution demand such notice.

On October 22, the bankruptcy court denied the Bank's second motion for relief from the stay. On October 27, the Debtor filed a First Amended Plan of Reorganization that effectively rendered moot the Bank's third motion for relief. On October 28, the court held a combined hearing on the motion to sell, objections to the motion to sell, and fourth motion for relief. The court received post-hearing briefs, and in

the resignations of all commissioners from any Improvement Districts and evidence that Buyer's nominees will be elected to fill the vacant commissioners' positions . . . ; an assignment to Buyer or Buyer's designee of all rights necessary to bore under the existing Union Pacific Railroad Company railway lines so as to bring sewer and other utility services to the Land . . . .

Because it has not been briefed by the parties, we make no comment as to the validity of any such assignment of rights, other than as follows. Commissioners control the Improvement Districts, recorded title holders of land may vote by a two-thirds majority to remove commissioners, and county courts appoint replacement commissioners. The Kellermans and their daughter (as commissioners) rather than the Debtor (as a landowner) hold the power to resign their posts as commissioners. The Kellermans were not listed as parties to the proposed contract, and the parties do not suggest the Kellermans' daughter had an ownership interest in the land.

November 2012, the court issued oral and written rulings granting the motion to sell and denying the fourth motion for relief.

In denying the fourth motion for relief, the bankruptcy court found the automatic stay applicable to the proposed action and found no basis for relief from the stay.  The court stated:

> Section 362(a)(3) of the Bankruptcy Code protects the *in rem* jurisdiction of this Court . . . .  This provision prohibits any act to obtain possession of or exercise control over property of the estate.  This provision bars any action that affects property of the estate, whether or not the debtor is named as a defendant in that action, and without regard to the form such interference takes.  If action taken against the non-bankrupt party would inevitably have an adverse impact on property of the bankruptcy estate, then such action should be barred by the automatic stay.
>
> . . .
>
> These improvement districts were created specifically for each property of the estate and/or even entitled according to the name of the governed property.  Without question, this lawsuit will have an adverse impact on and interfere with those properties.  As such, the proposed lawsuit will act to exercise control over property of the estate and relief from the automatic stay is required and will not be granted.

The court then described the Bank's repeated motions for relief as repetitive and as evidence of an intent to run up costs for the Debtor and litigate the bankruptcy into failure.  The court stated that it did not view the underlying proposed state court action as particularly meritorious, but the court made "its determination on this motion for relief without issuing a determinative ruling on the merits of the underlying argument."  The court provided a detailed timeline of events, including the Bank's initiation of the foreclosure action and its renewal of loan documents.  The

court described these events as examples of times that the Bank could or should have reviewed publicly recorded documents about the collateral. The court concluded that the Bank must have had actual notice of the Improvement Districts more than two years prior to filing the fourth motion for relief. Given the timing of this filing, the court viewed the fourth motion for relief as motivated by a desire to complicate and thwart the proposed sale and not as a genuine effort to vindicate due process rights.

The court concluded that the fourth motion was barred by laches, although the court did not make a finding of detrimental reliance upon the Bank's delay in challenging the Improvement Districts. In finding laches applicable—based upon the timing described above and based upon the court's findings regarding the Bank's motivations—the court concluded that the Bank did not file the motion in good faith. It does not appear that the absence-of-good-faith determination served as a stand-alone basis for denial of the fourth motion. Rather, it appears to have been part of the laches analysis.[2] The court issued an order to show cause why the Bank's attorneys should not be sanctioned for their actions.

In making these determinations, the court based its ruling upon the timing of the Bank's actions and upon evidence received at the various hearings described above. Following the last hearing, the court invited and received post-hearing briefs from the parties in lieu of closing arguments. The Debtor had not raised the issue of laches, however, and the parties had not tendered evidence or made arguments specifically concerning the reasons for, or the reasonableness or unreasonableness of, any delays in filing. Rather, the court issued the laches and absence-of-good-faith

---

[2]The court concluded:

The Court finds cause does not exist under Section 362(d)(1), that the fourth motion for relief was not filed in good faith, and that National Bank's opportunity to raise its due process issue at this stage of the action is barred by the equitable doctrine of laches.

rulings *sua sponte* in an oral ruling. The court later supplemented and amended its oral ruling with a written order but did not revisit the issues of laches or good faith.

The Bank appealed to the BAP, and the BAP affirmed regarding the applicability of the automatic stay to the proposed action against the Improvement Districts. The BAP declined to address any other issues. While the case was pending before the BAP, the bankruptcy court issued an order memorializing an agreement reached by the Bank, the Bank's attorneys, and the court regarding the order to show cause. Ultimately, the attorneys were ordered to pay sanctions of $14,400 to the Debtor, the attorneys disclaimed any admission of contemptuous conduct, and the parties to the agreement declared that they did not view the agreement as impacting any issues involved in this appeal.

On appeal, the Bank argues the bankruptcy court erred in finding the automatic stay applicable to the proposed action against the Improvement Districts. The Bank also challenges the laches ruling. Regarding the good-faith determination, the Bank appears to recognize that the good-faith determination was not presented as an independent basis for denying the fourth motion for relief. The bank has not appealed the show cause order, and the "agreement order" issued while the present case was pending with the BAP appears to have resolved issues surrounding the good-faith determination.[3]

---

[3]In its brief on appeal to our court, the Bank "respectfully requests that this court address [the good-faith issue] to avoid risk that this finding may have a preclusive effect." We decline to do so finding no appealable issue remaining for our review: the good-faith ruling did not control disposition of the fourth motion for relief, and the collateral issue of the show-cause order and sanction was resolved by the later order memorializing an agreement between the bankruptcy court and the relevant parties.

## II.

### A. Automatic Stay

The automatic stay applies to actions against the debtor, 11 U.S.C. § 362(a)(1), and actions "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," 11 U.S.C. § 362(a)(3). The automatic stay does not, in general, apply to actions against third parties. See, e.g., Sav-A-Trip, Inc. v. Belfort, 164 F.3d 1137, 1139 (8th Cir. 1999) (holding that an automatic stay applicable to a defendant firm and one of its employees did not extend to nonbankrupt codefendants). "The only exception to this rule that any of the circuits recognize seems to relate only to nonbankrupt codefendants in 'unusual circumstances.'" Croyden Assoc's v. Alleco, Inc., 969 F.2d 675, 677 (8th Cir. 1992) (quoting A.H. Robins Co. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986)). "The unusual circumstances in which the bankruptcy court can stay cases against non-debtors are rare." Ritchie Capital Mgmt., L.L.C. v. Jeffries, 653 F.3d 755, 762 (8th Cir. 2011).

The proposed action in this case was not an action against the Debtor. It was an action against the Improvement Districts alleging invalidity of the Improvement Districts due to constitutionally infirm notice surrounding their creation. The Improvement Districts—quasi-governmental entities—enjoy an existence separate from the Debtor. See Ark. Code Ann. § 14-93-112 ("Each district shall be a body corporate with power to sue and to be sued, and it shall have a corporate seal."). Such districts are created by the authority of the Arkansas county courts and require a unanimous petition from the recorded title holders to all land to be included in such districts. Id. § 14-93-105 to 106. They are controlled by a court-appointed board of three commissioners. Id. § 14-93-107. That board has the power to vote for dissolution of such districts. Id. § 14-93-127. Landowners within the districts maintain the right to vote out board members by a two-thirds majority vote, but

-9-

landowners do not enjoy the right to appoint the replacement commissioners directly. Id. § 14-93-108. Rather, the county court is required to appoint commissioners. Id. § 14-93-105(a)(2).

The Improvement Districts, while not private corporations in the traditional sense, are entities with the corporate capacity to sue and be sued. Ark. Code Ann. § 14-93-112. They possess a limited power of eminent domain and the authority to enter into contracts, incur debts, cause expenses or benefits to be assessed against covered properties, and, ultimately, cause such assessments to be levied as taxes against the covered properties with such tax levies to enjoy priority lien status. Id. §§ 14-93-113 (eminent domain), 107 (enter into contracts and leases and make conveyances), 116–17 (assess benefits and damages), & 119–22 (tax levies and priority liens). We believe it is clear, then, that the Improvement Districts are separate legal entities not expressly covered by § 362(a)(1).

Further, the proposed action was not an action "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The property of the estate includes the Sunset Lake Parcel and the Lots. The Improvement Districts themselves are not property of the estate. If successful, the proposed action involving constitutional due process challenges to the establishment of the Improvement Districts would, at most, impact the existence or efficacy of the Improvement Districts. No such action would change control of the Debtor's property or divest the estate of possession of the property.

The question remains whether any unusual circumstances exist that might justify a departure from the general rule and allow the automatic stay to apply to the presently proposed action against third parties who are neither the Debtor nor property of the Debtor. The Debtor asserts that the Improvement Districts, in practical effect, are so integrally related to the estate property that they should not be

treated as having a formally separate existence. This argument is a type of alter-ego theory attempting to bring the presently proposed action within the reach of 11 U.S.C. § 362(a)(1). The Debtor also asserts that extension of the automatic stay against a third party is permissible if a proposed action would have a possible adverse impact upon the value of the estate. This argument asserts that the presently proposed action is sufficiently similar to an action as described in 11 U.S.C. § 362(a)(3) to be treated like an action "to obtain possession" or "exercise control over" estate property.

Regarding the alter-ego or "integrally related entity" argument, we believe the present situation falls short of the type of "rare" and unusual circumstance that might justify extension of the automatic stay. Here, not only are the Improvement Districts legal entities separate from the Debtor, they are not controlled by the Debtor. Pursuant to Arkansas statutes, the Debtor, as a landowner, has the right to petition for removal of commissioners, and the county court has the authority to approve replacement commissioners. Ark. Code Ann. §§ 14-93-108. Presently, the Kellermans—the individual, natural-person owners of the Debtor—along with their daughter, serve as the commissioners of the Improvement Districts. The Kellermans, rather than the Debtor, control the Improvement Districts, and the Kellermans are not the bankrupt debtors. The estate simply does not "own" the Improvement Districts.

For whatever beneficial reasons, the Kellermans elected to create the Debtor as a corporate entity and then, acting through the Debtor, created the Improvement Districts. See Trustees of the Graphic Commc'n Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal, 516 F.3d 719, 729 (8th Cir. 2008) ("As a corporate matter, [owning property in a separate corporation] is a common practice, considered wise from a business perspective."). We do not simply brush aside the consequences flowing from these decisions or the separate identities of the individual commissioners, the Debtor, and the Improvement Districts merely because we are able to trace a chain of ownership and control back to the same natural persons who now seek to disregard their earlier decisions. See, e.g., Lovett v. Gen. Motors Corp.,

-11-

975 F.2d 518, 521–22 (8th Cir. 1992) (rejecting an individual's attempt to have a court treat his own corporation as an alter ego so that he could assert antitrust standing).

Further, even if it were somehow possible to characterize the Improvement Districts as subsidiary corporations wholly owned by the Debtor (or owned by an asset of the Debtor), the automatic stay does not, in general, apply to actions against parties who enjoy factual or legal relationships with a debtor, such as a debtor's wholly owned subsidiaries. See, e.g., Kreisler v. Goldberg, 478 F.3d 209, 213 (4th Cir. 2007) (rejecting application of the automatic stay to an action against the assets of a wholly owned subsidiary and stating, "It is a fundamental precept of corporate law that each corporation is a separate legal entity with its own debts and assets, even when such corporation is wholly owned by another corporate entity. . . . [A] judgment against [a debtor's wholly owned subsidiary] imposes no obligations or liability on [the debtor, who] therefore cannot be accurately described as the real-party defendant in the suit . . . ."); Croyden Assoc's, 969 F.2d at 677 (finding no unusual circumstances and stating, "We are persuaded that the stay required by section 362 should extend only to claims against [the party in bankruptcy], and that the stay is not available to nonbankrupt codefendants . . . even if they are in a similar legal or factual nexus with the debtor." (internal citations and quotation marks omitted)).

We have suggested that an automatic stay in another context might apply where the identity between parties is so great as to make "'a judgment against the third-party defendant . . . in effect . . . a judgment or finding against the debtor.'" Ritchie Capital, 653 F.3d at 762–63 (quoting McCartney v. Integra Nat'l Bank N., 106 F.3d 506, 510 (3d Cir. 1997) (addressing an analogous context of a security receivership court's anti-suit injunction)). In Ritchie Capital, however, we did not find a sufficiency of identity to justify the extension of a stay. Id. at 763. Similarly, in Stephen Inv. Sec's, Inc. v. S.E.C., we noted the possibility of such an extension "under limited

circumstances," but again refused to extend a stay. 27 F.3d 339, 342 n.5 (8th Cir. 1994) ("Some courts have acknowledged that under limited circumstances where an identity of interest exists between a debtor and a third party non-debtor, a bankruptcy court's automatic stay might also apply to property of the third party non-debtor. Even if we were to acknowledge this limited exception, we would conclude that there is an insufficient identity of interest . . . ." (internal citations omitted)). In general, then, we have recognized the *possibility* of expanding the automatic stay when presented with "unusual," "rare," or "limited" circumstances, but we have found these restrictive terms to have real meaning, and we have not lightly extended the stay. See also C.H. Robinson Co. v. Paris & Sons, Inc., 180 F. Supp. 2d 1002, 1015 (N.D. Iowa 2001) ("Eighth Circuit caselaw . . . is illustrative of a generalized reluctancy to expand the scope of the automatic stay provision of the Bankruptcy Code and to limit any expansion to truly extraordinary cases.").

Regarding the impact-on-value argument, we again believe that the present situation fails to present the unusual circumstances that might justify extension of the automatic stay. In making its impact-on-value argument, the Debtor points to testimony from persons associated with the proposed purchaser, ERC, emphasizing the importance of ensuring access for the installation of sewers and utilities on the 45-acre portion of the Sunset Lake Parcel. The Debtor also points to testimony from Dana Kellerman who opined that the Improvement Districts add a "huge improvement to all the properties out there by bringing sewage to it." The Debtor argues that without the Improvement Districts in place, the Lots will be less valuable to potential buyers.

It appears that the Debtor actually presents two arguments in this regard: (1) *any* impact on the value of estate property is sufficient reason to extend the stay, and (2) if a substantial impact is required, such an impact has been shown in this case. We reject both arguments. We find no support for the view that any and all minor impacts on the value of estate property can justify the extension of the stay. And,

-13-

even assuming that the estate property might be deemed by potential buyers to be less valuable without the Improvement Districts, we do not believe the evidence in this case shows that any such change in value would be sufficiently great to justify extension of the stay pursuant to a more demanding test.

To support its argument that any impact on value may suffice, the Debtor cites In re 48th Street Steakhouse, Inc., 835 F.2d 427, 430 (2d Cir. 1987), and Adelphia Commc'ns Corp. v. America Channel, LLC, 345 B.R. 69, 75–76 (Bankr. S.D.N.Y. 2006). These cases, however, do not stand for the broad proposition the Debtor advances. Rather, viewed collectively, we believe these cases show only that the bankruptcy estate is to be construed broadly as encompassing a debtor's many and varied property interests.

In re 48th Street Steakhouse involved a bankrupt corporation operating a restaurant in leased space at 10 Rockefeller Plaza in New York City. The debtor corporation had assigned the lease, along with several security interests, to a third-party creditor. The assignment provided for a return assignment of the lease to the debtor upon mutual agreement of the debtor and the third-party creditor. The lease in question, and continued operation at that location, appear to have been vital to any possibility of success in bankruptcy. The landlord sent the third-party creditor a notice of termination after the debtor filed for bankruptcy, and the debtor argued the automatic stay prevented termination of the lease. The landlord characterized the debtor's interest as that merely of a sub-lessee and argued the automatic stay did not apply.

The Second Circuit held that the automatic stay applied pursuant to 11 U.S.C. § 362(a)(3) because the physical possession and sublease interest were qualifying property interests belonging to the estate. In re 48th Street Steakhouse, 835 F.2d at 430. According to the Second Circuit, the issue before the court was "whether a sublease constitutes property of the bankrupt estate and whether the Landlord's

-14-

sending of a termination notice to [the third-party creditor] violated the automatic stay with respect to [the debtor]." Id. The Second Circuit held that the bankruptcy estate was to be construed as broadly encompassing all of the debtor's property interests, including a leasehold or physical possessory interest in property occupied by the debtor but held by third-party creditor.

In re 48th Street Steakhouse, then, did not actually involve a question of "unusual circumstances" justifying any atypical extension of an automatic stay to a suit against a non-debtor or non-estate property. Nevertheless the Debtor quotes language from the Second Circuit stating, "If action taken against the non-bankrupt party would inevitably have an adverse impact on property of the bankrupt estate, then such action should be barred by the automatic stay." Id. at 431. We view this language as dicta given the determination that the leasehold interest was estate property. Further, even if the case did stand for a broader proposition concerning suits against non-debtors or against non-estate properties, the facts show the leasehold interest at stake was of critical value to the estate and would be wholly destroyed, thus thwarting any successful emergence from bankruptcy (given the uniqueness of the location and the nature of the business).

In Adelphia Commc'ns, a bankruptcy-arranged sale of substantially all of several debtors' assets was scheduled to occur in relation to "230 jointly administered chapter 11 cases." 345 B.R. at 71. The property at issue in the sale included $17.6 billion of cable and communication properties. Competing cable companies not involved with the sale sought to enjoin the sale in state court on antitrust grounds. The competing companies strategically omitted the bankrupt debtors from their injunction complaint. The bankruptcy court determined, however, that, "[a]n injunction in [state court] against a closing of the Debtors' sale of their assets would inevitably have an adverse impact on the property of the bankrupt estate in a hugely damaging way." Id. at 77 (citation omitted). Given the facts of the action in Adelphia Communc's—a suit to enjoin a sale of actual estate property—it appears

-15-

clear that the attempted injunction action was a violation of the *in rem* provisions of 11 U.S.C. § 362(a)(3). As such, Adelphia Commc'ns simply is not applicable to the present case nor is it even clear that it can be considered at all instructive in the area of suits against third parties.

Assuming a sufficiently substantial impact on the value of estate property could justify extension of the automatic stay against non-Debtors and against non-estate property, however, no such substantial impact is shown by the evidence in this case. The actual testimony from the ERC representative that the Debtor cites proves only that ERC places substantial importance on the existence of an easement for utility access. When questioned, the representative stated, "It's our understanding that the improvement districts hold certain easements to get sewer services to the property. And that's their main value to us. We don't intend, today, of using them for their financing purposes." In a follow-up question, counsel for the Bank asked, "Your sole reason at this point in time for wanting the improvement district control is to ensure the easement and access to the property for sewer and utilities?" And the representative from ERC responded, "Yes sir."

The record does not show that the Improvement Districts were the sole means to ensure such access, undercutting the Debtor's argument that the record in the present case shows the Improvement Districts add substantial value. Further, the evidence the Debtor cites in no manner quantifies the value of estate property with and without the Improvement Districts.

We do not purport to hold the Improvement Districts add no value. The question we face, however, is not whether the record shows they add *some* value to the property. The question is whether they add so much value to the property that their possible elimination would effectively divest the Debtor of a property interest. Nothing in the record suggests an impact of this magnitude. Accordingly, even

-16-

assuming a substantial impact on the value of estate property could ever justify extension of an automatic stay, it could not justify it in this case.

## B. Section 105

The Debtor argues in the alternative that the judgment below can be supported by the general authority of 11 U.S.C. § 105 which "permits the bankruptcy court to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'" In re Titan Energy, Inc., 837 F.2d 325, 328 n.5 (8th Cir. 1988) (quoting 11 U.S.C. § 105). The Bank, in turn, argues § 105 does not support the judgment because a § 105 stay is akin to an injunction and the Bank was not afforded the procedure and protections attendant to the issuance of an injunction. Here, we do not read the bankruptcy court's oral or written orders as purporting to exercise the broader equitable powers of 11 U.S.C. § 105. As such, we are presented with no opportunity to review an application of § 105.

We write further, however, because we believe that in a situation such as this, where the proposed action involves only third parties and no estate property, and where an "unusual-circumstances" "exception" would be needed to justify extension of the automatic stay, § 105 is the more appropriate source of authority for assessing the propriety of a stay. We also agree with the Bank that a stay issued pursuant to that section should be treated as an injunction.

In E.E.O.C. v. Rath Packing Co., 787 F.2d 318, 325 (8th Cir. 1986), we stated:

> Section 105 gives the bankruptcy court the power to issue orders necessary or appropriate to carry out the provisions of Title 11. The All Writs Act, 28 U.S.C. § 1651, authorizes bankruptcy courts to issue stays. "Stays or injunctions issued under these sections will not be automatic upon the commencement of a case, but will be granted or issued under the usual rules governing the issuance of injunctions." In re Vantage

-17-

Petroleum Corp., 25 B.R. 471, 476 (Bankr. E.D.N.Y. 1982). "[S]tays will be granted only if a party shows a necessity for a stay." In re Bel Air Chateau Hospitals, Inc., 611 F.2d at 1251; see In re Matter of Shippers Interstate Service, Inc., 618 F.2d 9, 13 (7th Cir. 1980).

Similarly, the Fourth Circuit in A.H. Robins, 788 F.2d at 1003, recognized that a bankruptcy court's broad equitable power to stay an action against a third party should rest upon normal considerations governing injunctive relief. That court stated, "[i]n exercising such power the court . . . must 'weigh competing interests and maintain an even balance' and must justify the stay 'by clear and convincing circumstances outweighing potential harm to the party against whom it is operative.'" Id. at 1003 (quoting Williford v. Armstrong World Indus., 715 F.2d 124, 127 (4th Cir. 1983)).

Our cases stating (but not holding) that the automatic stay may be extended in "unusual circumstances" trace their authority to A.H. Robins. See Stephens Inv. Sec., Inc., 27 F.3d at 342 n.5; Croyden Assoc's, 969 F.2d at 677. In A.H. Robins, the Fourth Circuit discussed different possible sources of authority to stay actions against non-debtors including §§ 362(a)(1), (a)(3) and 105. The district court in that case, however, had actually "applied the test for a grant of preliminary injunctive relief," A.H. Robins, 788 F.2d at 1008. And the Fourth Circuit held, "we have no difficulty in sustaining the grant of a preliminary injunction herein." Id.

We see little reason to expand A.H. Robins beyond this holding or to complicate the analysis of stays against non-debtors by taking them outside the framework of § 105 and "the usual rules governing the issuance of injunctions." Rath Packing Co., 787 F.2d at 325; C.H. Robinson Co., 180 F. Supp. 2d at 1015 (setting forth an in-depth summary of bankruptcy stays against non-debtors and concluding that § 105 should govern in such situations and should rest upon standards and procedures for injunctive relief). The procedures and standards applicable pursuant to § 105 as referenced in Rath Packing provide a more than adequate framework for assessing the propriety of stays in "unusual" situations.

-18-

As noted by the court in <u>C.H. Robinson Co.</u>, several courts have interpreted <u>A.H. Robins</u> as approving of injunctive relief pursuant to § 105 but not calling for the automatic extension of § 362 stays against third parties. <u>See</u> <u>C.H. Robinson</u>, 180 F. Supp. 2d at 1011 (listing authority and stating, "several subsequent courts to apply <u>A.H. Robins Co.</u> have held that extensions of the automatic stay to preclude the continuation of a suit against a non-debtor are essentially a utilization of the bankruptcy court's equity jurisdiction under section 105 to issue an injunction extending the stay"). This interpretation is consistent with the legislative history and purpose of the automatic stay: to prevent a race by creditors, provide an orderly liquidation involving equal treatment of creditors, and provide breathing room for the debtor free from actions against the debtor and its assets. <u>Id.</u> at 1016 (discussing H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 340 (1978), U.S.C.C.A.N. 1978, 6297 & S. Rep. No. 95-989, 95th Cong., 2d Sess. 54–55 (1978), U.S.C.C.A.N. 1978, 5787, 5840–41 (additional citations omitted)). Where suit is brought against a third party rather than against the debtor or the debtor's property, § 105 and the usual standards, procedures, and burdens of proof for injunctive relief remain available. It is difficult to see how the suspension of these standards and the automatic application of a § 362 stay in a suit against a non-debtor furthers the legislative goals. Moreover, use of § 105 rather than a tortured expansion of the automatic stay avoids problematic notice issues (albeit issues not raised in the present case), namely, parties inadvertently violating an automatic stay and exposing themselves to potential sanctions due to a lack of notice concerning its applicability towards a third party.

## C. Laches

The equitable doctrine of laches may permit dismissal of a claim if there is both an unreasonable delay and some change in position in reliance upon the delay which makes maintenance of the claim inequitable. <u>See, e.g.</u>, <u>Mobil Exploration & Producing N. Am., Inc. v. Graham Royalty, Ltd.</u>, 910 F.2d 504, 507 (8th Cir. 1990); <u>Larco, Inc. v. Strebeck</u>, 2010 Ark. App. 263, ___ S.W.3d ___, 2010 WL 956194 (Ark.

Ct. App. March 17, 2010). Here, the Bank argues that, although the bankruptcy court discussed the length of delay between the formation of the districts and the Bank's filing of the fourth motion for relief, the court received no evidence and made no findings regarding either the unreasonableness of any such delay or the issue of detrimental reliance. The Bank also argues it was afforded no opportunity to explain the timing of its motions. Finally, the Bank points out that the Debtor did not present evidence as to these issues in response to the fourth motion for relief.

Having reviewed the court's oral ruling and written orders, we believe the Bank's argument is correct. Although the Debtor filed a post-hearing brief addressing the fourth motion for relief, it did not introduce evidence concerning the reasonableness of the Bank's delay. Further, the Bank was not on notice that the court intended to *sua sponte* apply the doctrine of laches. As such, the Bank had no reason to present evidence to justify its delay. Without a showing of detrimental reliance and without an opportunity to address the reasonableness of the delay, application of laches was improper. See Mobil Exploration, 910 F.2d at 507 (affirming a district court's refusal to apply laches based upon the absence of detrimental reliance).

In addition, regarding the timing of the filings in this case, we note that both the BAP and the Debtor emphasize that the Improvement Districts could not have imposed liens on the estate property while bankruptcy was pending. Further, throughout the bankruptcy and up until the proposed division of the Sunset Lake Parcel, control of the Improvement Districts was consolidated with the Debtor's owners and their daughter. The proposed sale sought to vest control of the Improvement Districts in a third party owner of a minority fraction of the Sunset Lake Parcel. Given these facts, it is not entirely clear that the present delay—during a period when the automatic stay would have prevented the placement of liens on estate property and when control of the improvement districts was in the hands of known parties—was unreasonable or that the timing of the fourth motion for relief was, itself, unreasonable.

Because we find the automatic stay inapplicable to the proposed state court action, we reverse the judgment of the courts below and remand for further proceedings not inconsistent with this opinion.

_____